No. 19,222.

ALICE HARTMAN, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

NEGLIGENCE—*Train Collision—Escape of Vicious Animal—Personal Injuries to Pedestrian—Negligence of Railway Proximate Cause of Injuries.* A collision between freight trains, caused by the negligence of the railway's employees, resulted in the wreck of a number of cars loaded with cattle, from which a number of wild, dangerous, Texas cattle escaped into the city of Harper, Kan., where, while they were being gathered up and driven to the stockyards, by persons employed by the railway for that purpose, one of the cattle, a cow, attacked and injured the plaintiff, who was walking on the sidewalk, this cow, after the wreck, before attacking the plaintiff, having made three separate attacks on one of the employees driving her. The railway is held liable for the damage done by this cow to the plaintiff.

Appeal from Harper district court; PRESTON B. GILLETT, judge. Opinion filed February 6, 1915. Affirmed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for the appellant.

*George E. McMahon,* and *Donald Muir,* both of Anthony, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff, Alice Hartman, recovered a judgment in the district court of Harper county, Kansas, against the railway company, for $800 damages for personal injuries caused by being knocked down and run over by a cow which had escaped from a car broken open in a collision. The defendant appeals.

Through the negligence of the defendant, a collision between two freight trains occurred on its road running east and west through the city of Harper. The

eastbound train was a special, with sixty-three cars, loaded with cattle. As a result of the collision several of these cattle cars were torn open and a number of cattle escaped therefrom into the city of Harper. The defendant employed several residents of Harper to gather up the escaped cattle and put them in the stockyards. One of these men was O'Connell. While these employees were gathering up the cattle, one of them, a cow, charged the plaintiff, knocking her down and injuring her. For this injury she brought this action.

A better understanding of how this cow acted, and of what those driving her did, can be had by quoting somewhat from appellant's abstract.

Mr. O'Connell testified:

"  .  .  .  Mr. Elder, the station agent, employed me to get some of the cattle in. It was about half-past one.  .  .  . I joined in there to help get the cattle back. To get the cattle back we were out there until about 6:30, as near as I could judge. As we got the cattle in we put them in the stockyards. Put seven head in there. The rest got away in different directions while we were taking this bunch out there. One of the cows laid down and kind of sulked and we went on with the balance and put them in the yards. Then I came back to see where the cow was. In the meantime she got up and started down the street. I followed her right up horseback, and she was going down the street, and I was not looking for anything to occur much. I was right after her horseback when this old lady was coming up the sidewalk. I was two or three rods behind the cow, riding along, and just as the cow got even with this old lady she whirled and made a run right towards her, and run over her, and knocked her down. The cow had shown a little bad disposition before that. She made two or three dives at the horse and me like any cow will when they get riled up and go to driving them—get warmed up. Most any cow will. The cow was supposed to be western bred. I could not say where she came from.  .  .  .  When I first came down to the stockyards she charged at me, and I got out of the way.  .  .  .  There were sidewalks along the street. I was thirty or forty feet behind at the time she made this rush for the old lady.

I saw Mrs. Hartman coming along. . . . I was on horseback. The cow was walking. I was not expecting her to run. I do not know if the fact that she had made some passes at me and my horse had anything to do with my staying so far behind. I was not particularly afraid of her at that time. I did not want to crowd her on. I was waiting for help. I felt at this time that I should have had more help with the cow. At the time I first saw Mrs. Hartman she was walking on the sidewalk. . . . When the cow came up near to Mrs. Hartman she turned and ran at her, tore down the street and ran for her and struck her. Threw Mrs. Hartman down and run over her. The cow went on through the fence, over the fence, turned a somersault right over the fence. Had some speed up. She had been walking quietly along just prior to that time. I was as close as twenty feet to her anyhow. After she turned before she struck Mrs. Hartman she had to travel 25 or 30 feet, or about half way across the street. There was a fence right against the sidewalk. The cow struck Mrs. Hartman and ran over her and turned a complete somersault over the fence. It was done so quickly I could not tell. I knew she went over it, turned right over. I thought she was going to get up and make for the old lady, and I run right across and told her to make for the house. Then I drove my horse right across the sidewalk and the cow got over the fence and turned and went down the street. I judge it was about five o'clock. I did not assist Mrs. Hartman at all. Went after the cow. The cow went down the street, and there were some children on the street. I went on down to get them out of the road. Hollered to the children to get out of the road, and saw Mrs. Hartman get up and go into the house . . . and I was trying to follow this cow up and do all I could. The cow went down on a vacant lot and laid down. I did not get the cow back up to the stockyards. I was running a livery barn, and about 6:30 I had to go back to the barn. The other boys came along with a rope, and had better saddle horses than I had to take hold of her. . . . Before she ran over the plaintiff I had been driving her with the other cattle. When she dropped from the bunch she laid down beside the road. She was pretty scrappy before that, fought the horse and fought us. A man named Jack Munger and I were

driving.  After she quieted down she acted like any other cow would under the circumstances.  We run them a good deal and got them warmed up, and they got mad. . . . This cow showed fight before she laid down.  That was before she struck Mrs. Hartman."

Sam Row testified:

"The cattle liberated were western cattle, long-horn cattle.  I would call them wild and scrappy cattle.  They were wild and savage."

The jury returned a general verdict in favor of the plaintiff.  Several special questions were submitted to the jury and answers returned, the material ones of which are as follows:

"1. Q.  What, if any negligence, was the defendant guilty of that caused the injury to the plaintiff, if any injury the plaintiff received?  A.  Neglect to perform their duty in failing to turn switch which caused wreck and liberated cattle.

"6. Q.  If the defendant's negligence caused the injuries complained of, give the name or position of the employee or employees guilty of such negligence.  A. Conductor.

"8. Q.  Had the animal that ran over the plaintiff been passing quietly down the highway in front of O'Connell for several blocks, just prior to the time plaintiff was run over by said animal?  A.  No.

"9. Q.  Was said animal passing down the highway quietly and in an ordinary walk, just prior to the time it ran over the plaintiff?  A.  Yes.

"10. Q.  After the animal in question ran over the plaintiff, was it driven for some distance by O'Connell in an ordinary walk to a lot where it lay down?  A. Yes.

"11. Q.  Were the cattle that escaped what is known as white-faced cattle (at least in the main)?  A.  Yes.

"12. Q.  If the cow that ran over the plaintiff was wild and dangerous, when did any representative of the defendant learn that fact?  A.  When said cow charged O'Connell.

"13. Q.  Who, if any one, learned said cow was dangerous?  A.  O'Connell and Sam Noel.

"14. Q.  Did the animal that ran over the plaintiff

belong to the species known as white-faced cattle? A. No.

"17. Q. What was the direct and immediate cause of the cow running over the plaintiff? A. Because of a vicious disposition.

"18. Q. How long was it from the time the cattle escaped until the plaintiff was run over by the cow in question? A. About four (4) hours.

"19. Q Are what is known as white-faced cattle wild, unruly or dangerous as a class? A. Yes.

"20. Q. Were these cattle what is known generally as the wild, dangerous Texas cattle? A. Yes."

A demurrer to the evidence was overruled, and a motion for judgment in favor of the defendant on the special findings was denied.

The defendant contends that the negligence of its employees in causing the wreck was not the proximate cause of the injury to the plaintiff; that there was an intervening cause of the injury; that this intervening cause was the act of the cow in charging the plaintiff; that the defendant had no knowledge of the cow's vicious disposition for a sufficient length of time in advance of the cow's attack upon plaintiff to have prevented the same by the exercise of ordinary care; that its employees did their best to drive the cow to the stockyards; that there was no contractual relation between plaintiff and defendant, and for that reason the defendant could not be guilty of negligence toward the plaintiff; and that for these reasons it is not liable to the plaintiff for the injuries sustained.

Was the negligence in causing the wreck the proximate cause of the injury to the plaintiff, as that expression is used in actions for damages for personal injury? The following cases may assist in answering this question.

"Negligence is the proximate cause of an injury when it appears that 'the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances.'" (*Schwarzschild v. Weeks*, 72 Kan. 190, syl. ¶ 3, 83 Pac. 406.)

"Negligence, to be the proximate cause of an injury, must be such that a person of ordinary caution and prudence would have foreseen that some injury would likely result therefrom, not that the specific injury would result." (*Railway Co. v. Parry,* 67 Kan. 515, syl. ¶ 2, 73 Pac. 105.)

"The proximate cause of an injury is the primary moving cause, without which it would not have been inflicted, and which, in the natural and probable sequence of events, without the intervention of any new and independent cause, produces the injury." (*City of Winona v. Botzet,* 94 C. C. A. 563, syl. ¶ 4, 169 Fed. 321, 23 L. R. A., n. s., 204.)

The negligence of the defendant's employees caused the wreck of cars loaded with cattle. From these cars some of the cattle escaped. Some of the escaped cattle did injury. This was the natural, probable and to be expected result of the negligence, and ought to have been foreseen by a person of ordinary caution and prudence, in the light of the attending circumstances. The specific injury could not be foreseen, but that these cattle would do some damage, in their fright or their anger, was very likely. That injury might reasonably have been expected to be to gardens, crops, animals or to persons. The negligence causing the wreck was the primary or first moving cause without which the injury would not have been inflicted.

Was there another, an intervening cause, between the defendant's negligence and the injury to the plaintiff?

"Where two distinct, successive causes, wholly unrelated in operation, contribute toward the production of an accident resulting in injury and damage, one of such causes must be the proximate, and the other the remote, cause of the injury.

"A prior and remote cause cannot be made the basis of an action for the recovery of damages if such remote cause did nothing more than furnish the condition, or give rise to the occasion, by which the injury was made possible, if there intervened, between such prior or remote cause and the injury, a distinct, successive, unrelated and efficient cause of the injury."

(*Railway Co. v. Columbia*, 65 Kan. 390, syl. ¶¶ 1, 2, 69 Pac. 338.)

"The intervening cause, which will relieve of liability for an injury, is an independent cause which intervenes between the original wrongful act or omission and the injury, turns aside the natural sequence of events, and produces a result which would not otherwise have followed, and which could not have been reasonably anticipated." (*City of Winona v. Botzet*, 94 C. C. A. 563, syl. ¶ 4, 169 Fed. 321, 23 L. R. A., n. s., 204.)

"The mere fact that another cause intervened between defendants' negligence and plaintiff's injury is not enough to relieve the former from liability if the intervening act was of such nature that its happening was to have been apprehended. Stated otherwise, the intervening cause will not relieve the original negligence of its actionable quality if the occurrence of the former might have been anticipated." (*Fishburn v. Railway Co.*, 127 Iowa, 483, 490, 103 N. W. 481.)

"If a carrier be guilty of negligence not in itself harmful, but wrongful only because of injurious consequences which may follow, and a new cause intervene between such negligence and the injury complained of, which new cause is not a consequence of the original negligence, which reasonable prudence on the part of the original wrongdoer could not have anticipated, and but for which the injury could not have happened, the new cause is the proximate cause and the original negligence is disregarded as not affecting the final result." (*Rodgers v. Railway Co.*, 75 Kan. 222, 88 Pac. 885.)

"The question of proximate cause is one frequently so near the border line as to cause much perplexity, but, generally speaking, it may be said in this state that the proximate is the producing cause; not the one supplying the condition, but the one producing the injury. The one supplying the condition may be so intrinsically careless as to amount practically to a continuing invitation, so to speak, for a direct cause to join in producing a disastrous result. But to be such it must present a condition of danger so manifest that the one responsible must be held to have been negligent in furnishing the means for a probable injury. But a condition which could not reasonably be expected to

endanger, and which but for some independent cause without which the injury would not have occurred would not have endangered, does not ordinarily amount to a proximate cause." (*Eberhardt v. Telephone Co.*, 91 Kan. 763, 765, 139 Pac. 416.)

"Where the intervening cause is set in operation by the original negligence, such negligence is still the proximate cause, and where the circumstances are such that the injurious consequences might have been foreseen as likely to result from the first negligent act or omission, the act of the third person will not excuse the first wrongdoer. . . . If the act of the third person which is the immediate cause of the injury is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the one guilty of the first act or omission, the connection is broken and the first act or omission is not the proximate cause of the injury." (*Seith v. Commonwealth Elec. Co.*, 241 Ill. 252, 260, 98 N. E. 425.)

"The primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end, that force being the proximate cause of the movement. . . . The question always is: Was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury?" (*Milwaukee, etc., Railway Co. v. Kellogg*, 94 U. S. 469, 474, 475, 24 L. Ed. 259.)

The injury to the plaintiff was related to the negligence of the defendant. That injury did follow, in regular order, the several successive events flowing from that negligence. There was an unbroken connection between that negligence and the injury to the plaintiff, unless the attack by the cow, or the acts of her drivers, broke that connection or succession of events. It can hardly be said that these acts—of cow or drivers —were causes independent of the original acts of negligence. The driving of the cow by the defendant's employees was made necessary by the wreck. It was the

duty of the defendant to gather up the liberated cattle. The producing cause, the one without which the injury would not have occurred, was the negligence of the defendant. That negligence made it necessary to employ the drivers. They were not acting independent of the defendant. Their employment was to have been anticipated. They were under the control of the defendant. The cow had no intelligence. She could not produce a cause of injury for which some person might be liable. The acts of the cow can not be said to have been a cause of the injury to the plaintiff, intervening between the negligence of the defendant and that injury, so as to relieve he company from liability for its negligence. The drivers may have been negligent in handling the cow, but that is not alleged and can not be considered. If they were negligent, and had been separate and independent agencies, the defendant probably would not be liable.

If McConnell had been the owner of the cow, would he be liable for the injury done? He learned that the cow was vicious when she charged him on three separate occasions, before injuring the plaintiff. McConnell then had notice of the cow's vicious disposition. It was then his duty to see that she did no injury to any one. He was then bound to use a degree of diligence that would prevent injury. It finally became necessary to rope this cow. That is probably what ought to have been done before she injured the plaintiff. The cow was in the streets of a city. She was almost sure to hurt some person, unless her freedom of movement was absolutely restrained. A jury would have been warranted in finding McConnell guilty of negligence in handling the cow, and therefore liable for the damage done by reason of that negligence. The owner of a domestic animal, known by him to be vicious, must see that it does no injury. (3 Enc. L. & P. 966; 1 R. C. L. 1088, 1089; 2 Cyc. 368, 369.)

In *Clowdis v. Fresno Flume etc. Co.*, 118 Cal. 315, 50 Pac. 373, 62 Am. St. Rep. 238, the owner of a bull

was held liable for injuries inflicted while the bull was being driven from one place to another, a vicious disposition being first developed on the trip, the injury being done after the bull had attacked several persons.

The jury found that the cattle were what is known as wild, dangerous, Texas cattle. By the negligence causing the wreck they were released in a city. It is only reasonable to expect this kind of cattle turned loose in a city to do damage, not only to property, but to persons as well. The fact that one of them did hurt an old lady, without any additional cause therefor, shows that injury ought to have been expected as a result of these cattle roaming on the streets of Harper.

It is generally known that wild, dangerous, Texas cattle will attack men on foot. When these cattle were released, it ought to have been anticipated that they would attack pedestrians whom they might meet.

In *Hammond v. Melton,* 42 Ill. App. 186, we find this:

"The owner of a domestic animal is bound to take notice of the general propensities of the class to which it belongs, and if such propensities are of a nature to cause injury he must anticipate and guard against them." (p. 189.)

"What is the proximate cause of an injury is ordinarily a question for the jury." (*Milwaukee, etc., Railway Co. v. Kellogg,* 94 U. S. 469, 474, 24 L. Ed. 259.)

(See, also, *Railway Co. v. Parry,* 67 Kan. 515, 73 Pac. 105; *Gas Co. v. Dabney,* 79 Kan. 820, 101 Pac. 488.)

"When the facts are established, whether the negligent acts complained of are the proximate cause of the injury is a question of law to be determined by the court." (*Light Co. v. Koepp,* 64 Kan. 735, 736, 68 Pac. 608.)

(See, also, *Dewald v. K. C., Ft. S. & G. Rld. Co.,* 44 Kan. 586, 24 Pac. 1101; *Eberhardt v. Telephone Co.,* 91 Kan. 763, 767, 139 Pac. 416.)

"In a case where it is either admitted, or from the

facts as found established, that two distinct, successive causes, unrelated in their operation, conjoined to produce a given injury, the question of remote and proximate cause becomes one of law for the decision of the court, and not of fact for the determination of the jury, and the determination of this question of law by the jury is not binding or conclusive on the court." (*Railway Co. v. Columbia,* 65 Kan. 390, syl. ¶ 3, 69 Pac. 338.)

It must be noted that in all the cases quoted from the question of proximate and intervening causes depends on their relation to or independence of each other.

Whether or not the question of proximate cause should have been submitted to the jury is unimportant, if we have reached a correct conclusion concerning the liability of the defendant on the facts as shown by its abstract. The question was submitted to the jury, and the jury, in their general verdict, found against the defendant, and the court approved the verdict. We are not unmindful of the answer to question seventeen. That answer is, that the direct and immediate cause of the cow's running over the plaintiff was her vicious disposition. But that vicious disposition was not the proximate cause of the injury to the plaintiff. That was an unintelligent dangerous force that had been loosed by the defendant's negligence.

The defendant cites 29 Cyc. 419, 426, to the effect that it owed no duty to the plaintiff. There was no contractual relation between the parties, but the defendant did owe to the plaintiff the duty of not injuring her by any agency it might set in motion.

We have given this case careful consideration, and are unable to say that the judgment should be interfered with, and it is therefore affirmed.

JOHNSTON, C. J. (dissenting) : I am unable to concur in the judgment of affirmance. The evidence sufficiently shows that the collision and resulting liberation of the cattle from the car were due to the negligence of the railway company, and for any injury that can be said to be the proximate result of that negligence

Hartman v. Railway Co.

the company is responsible. The injury, however, was not inflicted when the cattle were liberated from the car, nor did it occur until a long time after the accident by which the cattle were released. In the four-hour period which elapsed between the time of the accident and the injury of the plaintiff the cow had strayed away a considerable distance and had even been lying down. O'Connell, who had a riding horse, was asked by the agent of the company to drive this cow and other cattle to the stockyards, and if through his negligence in driving the cow an injury was inflicted the company may be held liable. The negligence charged and upon which the verdict rests is the improper switching of the trains which resulted in the collision. The collision, in my opinion, can not be regarded as the producing or proximate cause of the injury. A party is not liable for every consequence, near and remote, which may possibly result from negligence. It is only those which are the natural and probable consequences of the negligent act and which should have been foreseen. The cow was run along the highway by O'Connell, and he says that when she got warmed up she became mad. She was a white-faced western cow, but plaintiff's witnesses said that any cow is likely to show such a disposition when she is so chased and in that respect she acted like an ordinary cow. The fact that she became excited and ugly under such treatment is not the proximate result of the failure to turn the switch, and, judged by common experience and observation, the likelihood that any one would be struck by the cow while she was being driven was not within reasonable anticipation and is not the natural and probable consequence of the collision. If an owner of a cow allowed her to escape because of an insufficient fence, and a neighbor in driving her home should run her and excite her and she should become ugly and run against a person on the highway, could it be said that the injury was the natural and probable consequence of the defective fence and that it was a result that the owner should have foreseen? To

my mind the injury to the plaintiff was not the natural or probable consequence of the collision. It was no more than a remote possibility that a cow so liberated would, while being chased by a horse about four hours later, run against and injure a person, and for such remote consequences there is no liability. There was another efficient and proximate cause of the injury, but whether the defendant was responsible for that cause has never been submitted to or determined by the jury. I am, therefore, of the opinion that the judgment should be reversed.

PORTER, J., and WEST, J., concur in the foregoing dissent.