No. 33,211

Amy W. Johnson, *Appellant*, v. Oscar H. Olson, an Individual
doing business as Olson & Sons Dairy, *Appellee*.

(67 P. 2d 422)

Opinion filed May 8, 1937.

*Arthur J. Stanley, H. S. Roberts, Elmer Martin* and *Leonard O. Thomas,*
all of Kansas City, for the appellant.

*David F. Carson,* of Kansas City, for the appellee.

The opinion of the court was delivered by

Dawson, C. J.: This was an action for damages for the death of
plaintiff's husband, who was killed by defendant's bull.

Defendant operated a dairy farm. He kept a herd of some sixty
milch cows and a young Holstein bull. Plaintiff's husband, John I.
Johnson, was an employee of defendant. His duties were those usual
around a dairy herd—feeding and milking the cattle.

At an early hour on the morning of February 27, 1935, while
Johnson was driving the herd from the pasture into the barnyard
he was attacked and fatally injured by a young Holstein bull.

By agreement with plaintiff, defendant bought and paid for a
cemetery lot for Johnson's burial, and paid his funeral expenses.
Plaintiff expressed a wish to return to Sweden, her native land, and
Olson promised to provide her with rail and steamship transporta-
tion. For these considerations she executed to defendant a written
release, reciting that she released and discharged him—

"From all claims, demands, damages, actions, or causes of action, on account
of injuries and death of my husband, John I. Johnson, from an accident to him,
which occurred on or about the 27th day of February, 1935, by reason of an

unexpected attack by a young bull, and of and from all claims or demands whatsoever in law or in equity which I, my heirs, executors, administrators or assigns can, shall or may by reason of any matter, cause or thing whatsoever prior to the date hereof."

Some time later this action was begun. Plaintiff alleged that she was the widow and sole heir at law of John I. Johnson, that no personal representative of his estate had been appointed, and that she brought the action as his widow. She alleged that February 27, 1935, her late husband was working for defendant, and—

"While in the course of his employment, he was driving some sixty cows from a pasture to a barnyard, and that with said cows, a bull, belonging to the defendant, was allowed and permitted to run at large; that while plaintiff's husband was in the act aforesaid, he was suddenly attacked by said bull and so severely gored that the injuries proved fatal, and that he died as a result thereof."

In her petition she also alleged that—

"Said bull had long horns, had no ring in his nose, and was dangerous, and known by the defendant at and before the time of said attack to be dangerous, and known by the defendant to be liable to attack anyone, and that it was dangerous to allow said bull to run at large where plaintiff's husband and others had to work."

In his answer defendant alleged that the deceased had worked in the dairy business for many years, and was familiar with the duties he was required to perform for defendant and that he assumed the usual risks incidental thereto.

Defendant also pleaded the facts of the release as recited in its terms.

In her reply plaintiff denied the execution of the release and denied the settlement as therein recited, and alleged that—

"If she executed any such purported release as claimed by the defendant, she did not know that she was so doing, that if the same was executed, it was done without explaining to this plaintiff what it was."

Answering further, plaintiff alleged that she did sign a paper upon defendant's representation that "if she did not want to be bothered with the hospital and undertaker that she would have to sign," and that—

"If said paper is the purported release alleged by the defendant . . . she did not know that the same was to be or was a release; . . . and that the same was obtained . . . by the false representations of the defendant as aforesaid, was wholly inadequate as to consideration, was obtained by misrepresentations referred to and is of no force and effect."

In the jury trial which followed plaintiff adduced evidence tending to show that during the summer and early autumn of 1934 defendant had a large Holstein bull which would chase people who ventured into the pasture; that the bull would bellow and paw and throw dirt, and show a vicious disposition, and "everyone around in the neighborhood knew that he was mean and were afraid of him."

However, as the trial progressed it was shown that defendant sold that bull in the first half of October, 1934, and shortly afterwards bought an eighteen-months-old bull calf which had been reared by hand; that it was gentle and had never shown any vicious habits; and that it was the animal which made the fatal attack on plaintiff's husband on February 27, 1935, when it was about twenty-two months old.

The jury returned a general verdict for defendant and answered special questions, some of which read:

"1. Had the bull in question in this litigation manifested any vicious tendencies at any time prior to the 27th day of February, 1935, when Johnson was killed? A. No.

. . . . . . . . . . . . .

"4. Do you find and believe from the evidence that Johnson was attacked by the bull in question in this litigation? A. Yes.

. . . . . . . . . . . . .

"6. . . . [Was] the bull which the defendant owned on February 27, 1935, . . . the one described by the witnesses for the plaintiff? A. No.

"7. When did the defendant acquire the bull which he owned on February 27, 1935? A. Last part October, 1934.

. . . . . . . . . . . . .

"10. Did the defendant buy for the plaintiff the cemetery lot and pay the funeral expenses of her husband? A. Yes.

"11. Was such payment made pursuant to the written agreement, defendant's exhibit 1, signed by the plaintiff? A. Yes.

"12. Was the agreement, defendant's exhibit 1, read to the plaintiff by one Adolph Olson? A. Yes.

"13. If you answer question No. 11 'Yes,' then state if the defendant did anything to prevent plaintiff from knowing or understanding the contents of the instrument which she signed, and which is marked 'Defendant's Exhibit 1.' A. No.

"14. If you answer question No. 11 'Yes,' then state if said defendant's exhibit 1 was fully explained to the plaintiff before she signed the same. A. Yes.

"15. If you answer question No. 11 'Yes,' then state if plaintiff fully understood the nature and purpose of said paper marked 'Defendant's Exhibit 1.' A. No.

"16. At the time plaintiff signed the paper introduced herein as defendant's exhibit 1, purporting to be a release, did the plaintiff know and understand the contents of said paper? A. Yes.

"17. When the plaintiff attached her signature to the paper introduced herein as defendant's exhibit 1, did she believe and rely upon statements made to her by the defendant as to the purport of the said paper? A. Yes.

"18. If you find from the evidence that John I. Johnson was killed by a bull belonging to the defendant, state whether or not said bull was vicious. A. No."

Judgment was entered for defendant, and plaintiff appeals, urging various errors which will be considered in the order they appear in plaintiff's brief.

She first complains of the trial court's refusal to permit a witness for plaintiff to testify regarding the propensities and likelihood of Holstein bulls to attack persons and the proper manner of handling Holstein bulls. The rejected evidence was produced by affidavit in support of the motion for a new trial. However, plaintiff's cause of action was not predicated on negligence. She alleged that the bull that killed her husband was known to be vicious, and that its ugly disposition was a matter of such common knowledge in the neighborhood that defendant was bound to know the fact. But the cause of action which plaintiff had pleaded went hopelessly awry when it was established, too clear for cavil, that the alleged vicious bull had been sold and delivered to the butcher months before the younger bull was acquired which fatally hurt Johnson in February, 1935. It was no part of plaintiff's pleaded cause of action that Holstein bulls are inherently ill-natured and disposed to attack people and particularly their caretakers, such as Johnson was at the time of his fatal mishap. Moreover, the rejected testimony was only offered in rebuttal; and its relevancy in support of plaintiff's cause of action was not apparent. (Abbott's Civil Jury Trials, 5th ed., § 90; 64 C. J. 145-146.)

It is next contended that the court erred in permitting defendant to show the previous gentle disposition of the bull which attacked Johnson. This contention is altogether untenable. Plaintiff had adduced evidence to show the evil disposition of a certain bull which defendant had owned in 1934, and her case was predicated on the assumption that it was that vicious bull which killed her husband. It was certainly competent and proper for defendant to show the facts, which naturally included testimony describing the bull which did attack Johnson, that it had been hand-reared by a neighbor, and that children were not afraid of it, and that it had never shown any hostility to people, not even to Johnson, who had the

feeding of it. In short, it was competent for defendant to adduce evidence which would tend to contradict or disprove plaintiff's evidence touching the previously known disposition of the bull. Counsel for plaintiff cite the case of *Hartman v. Railway Co.*, 94 Kan. 184, 146 Pac. 335. In that case a carload of Texas range cattle were let loose in the city of Harper as the result of a train wreck caused by defendant's negligence. One of the cattle charged the plaintiff, knocked her down and injured her. But Texas range cattle twenty years ago were all wild and dangerous; and the animal which injured the plaintiff had shown a vicious disposition before it attacked the plaintiff. Obviously this case is not in point. Neither is the case of *Carl v. Ackard*, 114 Kan. 640, 220 Pac. 515, where liability was imposed for the death of plaintiff's daughter, who was killed by defendant's mule, whose breachy and vicious disposition was notorious.

Liability for injury to persons caused by domestic animals has been the subject of legislation and judicial consideration since the remotest ages. The general rule has always been and still is that if the evil disposition of a domestic animal was previously known, its owner was liable as an insurer; otherwise he was not. (Exodus, 21:28-36; 2 Cooley's Blackstone, 3d ed., Book III, 153, and Book IV, 197; Wharton on Negligence, §§ 918-926; 3 Shearman & Redfield on Negligence, 6th ed., §§ 628, 629.) An instructive excerpt from the old case of *Rex v. Huggins,* decided in 1730, and reported in 2 Ld. Raym., 1574, 1583, reads:

"There is a difference between beasts that are *ferae natura,* as lions and tigers, which a man must always keep up at his peril; and beasts that are *mansuetae natura,* and break through the tameness of their nature, such as oxen and horses. In the latter case an action lies, if the owner has had notice of the quality of the beast; in the former case an action lies without such notice. As to the point of felony, if the owner have notice of the mischievous quality of the ox, etc., and he uses all proper diligence to keep him up, and he happens to break loose, and kills a man; it would be very hard to make the owner guilty of felony. But if through negligence the beast goes abroad, after warning or notice of his condition, it is the opinion of Hale, that it is manslaughter in the owner. And if he did purposely let him loose, and wander abroad, with a design to do mischief; nay, though it were but with a design to fright people and make sport, and he kills a man; it is murder in the owner."

Error is also assigned on the trial court's instructions touching the assumption of risk. In substance the trial court instructed the jury

that in the course of his employment as a caretaker and feeder of defendant's dairy cattle, plaintiff's husband assumed the usual risks of his employment, including whatever was the common hazard of attack and injury from dairy animals, and likewise any such hazards as were as much within the range of his own knowledge as of that of his employer; and if his death occurred from his incurring such usual and known risks there could be no recovery. We think the instructions on this phase of the case were adequate and precise, in view of the evidence. Counsel for plaintiff bring into their argument that line of cases which hold it to be the employer's duty to furnish his employee with safe appliances, animate as well as inanimate, with which to work. We think such cases so manifestly not in point that they need not be considered. The requested instructions did not materially differ from those given except on one point where plaintiff's view of the law was that Johnson had a right to assume that defendant had exercised ordinary and reasonable care to see that the deceased was given "reasonably safe animals with which to work." Such an instruction was properly refused in view of the pleaded cause of action and all the pertinent evidence.

Plaintiff also seeks to predicate error on the argument of defendant's counsel on the contended ground that it tended to "inflame and prejudice the jury against plaintiff." We have read patiently the argument complained of. Counsel did comment with some acerbity upon what he conceived to be the adroit maneuvers of plaintiff's counsel to rescue his client from embarrassing questions propounded to her in cross-examination, and touching her seeming lack of knowledge of the English language when questions on cross-examination were propounded to her; and her ready understanding of that language when she was addressed by her own counsel. Nothing approaching the gravity of reversible error can be discerned under this assignment.

There is nothing further in this record to justify discussion. The judgment is affirmed.