No. 24,285.

George O. Limbaugh, *Appellee,* v. Charles E. Schaff, as Receiver, etc., *Appellant.*

SYLLABUS BY THE COURT.

Negligence—*Collision—Automobile and Train—Findings—Driver of Automobile Guilty of Contributory Negligence.* Findings of fact considered in an action for damages for injury sustained in a collision between an automobile and a passenger train at a street crossing, and held, the automobile driver was guilty of contributory negligence.

Appeal from Bourbon district court; Edward C. Gates, judge. Opinion filed July 7, 1923. Reversed.

*W. W. Brown,* of Parsons, and *Douglas Hudson,* of Fort Scott, for the appellant.

*A. M. Keene,* and *Harry W. Fisher,* both of Fort Scott, for the appellee.

The opinion of the court was delivered by

Burch, J.: The action was one for damages for injury to person and property of an automobile driver, sustained in a collision with one of defendant's trains at a street crossing. Plaintiff recovered, and defendant appeals.

The street, known as Shute street, runs north and south in the city of Fort Scott. The railroad runs east and west, curving slightly toward the south. The main portion of the city is toward the south. At a point 12 feet south of the crossing the street level is 1.6 feet below the railroad track. South of that the street is level for a distance of 250 feet. Mill street is 946 feet east of Shute street, and beyond that trains from the east come into view through a cut in a hill. Looking eastward up the track, the skyline is 14 or 15 feet above the tracks. On the east side of the street, 64 feet south of the crossing, was a small tree, which at the time of the accident was without foliage. Plaintiff testified the tree did not obstruct his vision, and there was nothing else within 300 feet of the crossing to obscure view of an approaching train.

The accident occurred on the evening of December 20, 1920. The precise time was not definitely established. Plaintiff testified it occurred at five minutes before five o'clock. Then he testified that was what some one said. Afterwards he testified it was five minutes before five. The sun set at 5:02. The train was due to leave Fort Scott at 5:12. Shute street is about a mile from the station, where the train arrived at 5:17. The jury found the accident occurred at 5:05. The headlight of the engine had not been turned on, and the findings placed defendant in the attitude of violating the interstate commerce commission regulation requiring a headlight between sunset and sunrise.

A city ordinance limited speed of the train to ten miles per hour. The engineer testified he was running at a rate of 12 to 15 miles per hour. The jury accepted this testimony as true, and found defendant negligent on account of high speed of the train.

The engineer testified he gave the station signal half a mile from the crossing, gave the crossing signal 80 rods from the crossing, and the bell was ringing when the train approached the crossing. The bell was operated by a bell-ringing device, and had been ringing for some time before the accident. Plaintiff testified he did not hear any bell, and the jury found the bell was not ringing.

The automobile was a Ford sedan. In the seat on plaintiff's right sat J. W. Calvin. Plaintiff testified the road was pretty rough, there were many bumps he could not miss. He traveled at a rate of 15 miles per hour until he was 50 or 60 feet from the tracks. He then slowed down and coasted at a rate of 5 miles per hour, not faster, and could have stopped the automobile "right now," "within 3 or 4 feet." He testified he was familiar with the crossing, and always took time to look to the east and to the west for trains. In this instance he looked both ways. When he was 20 or 30 feet from the crossing, or further back, he looked. After looking toward the west, he was looking toward the east all the time, and he saw Calvin looking. When the automobile was on the crossing, Calvin shouted, "Look out!" Plaintiff then saw the engine 20 feet away. He shifted to low gear and gave the engine gas, but was struck instantly. Calvin was killed, the car was demolished, and plaintiff was injured.

Plaintiff testified he looked toward the east so much because he could not see. It was so dark he could see just a few feet ahead of his car, 6 or 8 feet. Later he said he could see 6 or 8 or 10 feet ahead of his car, and he finally said he supposed he might have

seen·the outline of a car 20 feet away. He had not turned on his own headlights—his batteries were low—and he just knew when he was approaching the railroad tracks. Just as Calvin spoke, he got a glimpse of the engine. Therefore, out of the blackness which covered plaintiff, impossible for eyesight to penetrate but a few feet—he said he had good eyesight—the engine suddenly, silently, swiftly loomed.

The official weather observer at Fort Scott testified he made observations at 6 o'clock. The sky was cloudy, and it commenced to rain at 8 o'clock. There was nothing peculiar about the day, just a cloudy condition before the rain. Other days in December were very much the same.

Some witnesses for plaintiff testified it was a dark evening. His wife said it was a real dark and stormy evening, and his brother said it was darker than usual. Lights had been turned on in shops and stores and houses as early as 4:30, which was not unusual. The county attorney said that about 5 o'clock it was too dark to read a law book in his office without artificial light. Calvin had a brother living at Richards, Mo. He was in a sawmill at the edge of timber on the bank of a stream, doing some fittings on engine bearings. It occurred to him to look at his watch. He could not, see the figures on the dial. Going to the firebox and opening the door, he saw it was between four and five minutes of five. Plaintiff, however, produced no witness other than himself who gave any testimony whatever regarding the distance large objects could be seen out of doors.

Like plaintiff, the engineer was running without a headlight. With responsibility resting on him for safety of the train crew and passengers, the defendant's property, and the lives and property of·travelers on the highways, the engineer had felt no need to turn on his headlight in the operation of his train, and he did not do so even after the accident occurred, until after he arrived at Fort Scott station.

There were seven cars in the train. It was stopped with five cars over the crossing. The engineer went back to the crossing without a lantern, and assisted the other trainmen in doing what was necessary. The train auditor talked to plaintiff, and made notes of the accident in his notebook. Calvin's body was put into the baggage car, and the train proceeded to Fort Scott station, all by daylight.

In the express car the express messenger was getting ready the

mail and express for Fort Scott without artificial light.    He did
not need it.    The porters had not lighted the coaches, the brake-
men carried no lanterns, and there was no artificial light on the
train.    Alfred Archer and wife, of Clinton, Mo., were passengers,
riding in the chair car.    Just before the collision Archer handed his
wife a newspaper and started for the smoking car.    His wife testified
she was reading the paper when the collision occurred.    Archer got
out of the train when it stopped, and testified he could see the Frisco
railroad crossing (which was 805 feet away), and could see a quarter
of a mile.    R. R. Bennett was in the smoking car when the collision
occurred.    He got off and went to the wreck of the automobile.
There were no lanterns used, and he could see the landscape, be-
cause it was daylight.    Defendant's freight agent, standing in the
bay window of the telegraph office at the station, saw the train when
it was one-eighth of a mile away, and watched it come into the sta-
tion.    There was no artificial light in the telegraph office, and none
of the station lights were turned on until after the train arrived.
A section foreman saw the train 800 or 900 feet away.    Several other
witnesses testified to facts rendering plaintiff's testimony preposter-
out, and the jury did not believe him, as will presently appear.

The fireman testified he was on the seat box on the south side of
the engine.    He said that when 50 or 60 feet from the crossing he
saw plaintiff, who was then about 30 feet from the crossing, and gave
the engineer the washout signal.    He thought plaintiff was going
about 15 miles per hour.    It was daylight, and he had no difficulty in
seeing plaintiff.

According to testimony of Calvin's brother, for ten minutes be-
fore the accident occurred, not a person on the train or at the sta-
tion could have made out the time of day by looking at his watch
face.    According to the testimony of plaintiff, who had been travel-
ing a rough and bumpy road at the speed of 15 miles per hour with-
out lights, the train was hidden in darkness; the landscape was
blotted from sight; the engineer could not see beyond the front of his
engine; and the fireman could not have seen the automobile before
it was on the track.    Of course the fireman did see the automobile,
and did give the emergency signal to the engineer; and the jury ac-
cepted the fireman's account of what occurred, with slight modifica-
tion of his estimate of distances, but with considerable modification
of his estimate of the speed of the automobile.    The material find-
ings follow:

"2. At what rate of speed was plaintiff's automobile traveling when 20 to 25 feet south of the point of collision? A. 5 to 7 miles per hour.

"3. What rate of speed in miles per hour was defendant's train traveling when 30 to 50 feet east of the crossing? A. 12 to 15 miles per hour.

"4. At the time the plaintiff was approaching the crossing in question at a point 40 to 50 feet south of the crossing on the public highway, how far could a train have been seen upon the defendant's main-line track east of the crossing in question? A. 40 or 75 feet.

"8. For what distance could defendant's passenger train number 9 be seen by the light of day at the time this accident happened? A. 40 to 75 feet.

"10. In what distance could plaintiff have stopped his automobile when approaching the crossing in question at a speed of five miles per hour? A. 3 to 5 feet."

The jury also returned the following finding:

"Was George O. Limbaugh using reasonable care for his own protection at the time the automobile in question approached and was crossing the railroad track of the defendant at the time of the alleged collision? A. Yes."

This finding is nullified by the specific findings relating to distances and speeds.

The findings relating to rates of speed were of course estimates. Comparing them, if the train were moving 12 miles per hour and the automobile 5 miles per hour, the train was moving 2⅖ times as fast as the automobile. If the train were moving 15 miles per hour and the automobile 7 miles per hour, the train was moving 2⅐ times as fast as the automobile. To say the train was moving 2½ times as fast as the automobile is to give plaintiff an advantage. The train and the automobile met on the crossing, and whenever plaintiff could have seen the train, it was 2½ times as far from the point of collision as the automobile.

If when plaintiff was 40 feet south of the crossing the train could have been seen at a point 40 feet east of the crossing, he could see the train at a distance of 56 feet. If when he was 50 feet south of the crossing the train could have been seen 75 feet east of the crossing, he could see the train 90 feet. Give him the advantage of the shortest distance, because according to finding No. 8 the mean distance the train could have been seen was 57 feet. Disregarding fractions, when plaintiff was 21 feet south of the crossing, the train was in sight 52 feet east of the crossing. If, as he said, he could have stopped his automobile within 3 or 4 feet, or if, as the jury said, within 3 to 5 feet, he could have had his automobile at rest from 18 to 16 feet from the crossing when the train reached the point of collision. He testified positively he was not going faster

than 5 miles per hour. He encountered a grade 12 feet from the track and, conceding he was going 7 miles per hour, he could have stopped in a place of perfect safety after the train came into view.

If plaintiff had testified he looked toward the east as he approached the crossing, saw no train or headlight, and relying on the fact that a headlight would be showing if a train were near, proceeded to drive upon the track, he might be relieved of contributory negligence. He did not pretend, however, that he was misled. On the other hand, he testified he kept boring into the darkness with his eyesight. The result is, if he were looking he did see what was within range of his vision, and if he were not looking, he is chargeable with what he could have seen.

Plaintiff yielded no further than to say he might have made out the outlines of a car 20 feet away. The jury refused to credit him, but none of the testimony he produced warranted the jury in arbitrarily doubling the distance. Evidently the jury made grudging concession to the overwhelming proof of light condition furnished by the defendant. Accepting the findings of the jury, plaintiff was guilty of contributory negligence as a matter of law.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for the defendant.

JOHNSTON, C. J., and HOPKINS, J., dissenting.