No. 24,980.

MYRTLE NEVITT, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

1. NEGLIGENCE—*Collision Between Automobile and Railroad—Issues for Jury—
   Excessive Speed of Train—Contributory Negligence of Deceased.* In a
   railway crossing accident case, the evidence examined and held sufficient
   to raise a jury question touching the negligence of the defendant in operat-
   ing its train at excessive speed and whether that excessive speed was a
   proximate cause of the accident, and whether the deceased, who was a guest
   in the automobile and was killed in the collision, was free from contributory
   negligence.

2. SAME—*Inconsistency in Special Findings of Insufficient Importance.* Cer-
   tain special findings not supported by evidence, examined, and held to be
   of insufficient importance to disturb the general verdict and judgment.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed
February 9, 1924. Affirmed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for
the appellant.

*Harold W. Herrick,* and *James A. McDermott,* both of Winfield, for the
appellee.

The opinion of the court was delivered by

DAWSON, J.: This was a railway crossing damage case.

Plaintiff's husband, George Nevitt, was riding as a guest in a
Ford car enclosed with an all-weather top. The driver was Irwin
Gibson who was seated on the left side, and Nevitt sat by his side
on the right. Olive street runs east and west in the north suburban
part of Winfield. The railway coming from the north intersects
Olive street at right angles. Irwin and Nevitt turned into Olive
street a short block east of the crossing. They drove westward
and as their car was going over the tracks it was struck by de-
fendant's train coming at high speed from the north and Nevitt
was killed.

The plaintiff, Nevitt's widow, charged defendant with negligence
in the operation of its train, causing the death of her husband, in
this—

"That said train was operated by the defendant, its employees and servants
at a high and excessive rate of speed in excess of forty miles per hour, and
through a populated portion of said city. . . . "

The evidence, while lengthy, showed little of importance except the main fact that Nevitt was killed at the railway crossing by being struck, or the Ford in which he was riding being struck, by defendant's train which was speeding at 40 to 55 miles an hour. About 600 feet north of the crossing the railway track veered to the northwest. East of the crossing on the north side of Olive street and close to the railway, there was a house and barn which shut off the view of an approaching train until the track was nearly reached, but no satisfactory evidence as to the approximate distance was given. One reason for such uncertainty, perhaps, was that by consent of all parties the jury were taken to view the situation and had a first hand view of the crossing, the approach from the east, the obstructions to the view, the limited distance between the first point of view and the point of collision, and the distance at which a train coming from the north could be seen by a person about to cross the track or to be driven as a guest across the track.

The driver of the car in which the deceased was riding, Irwin Gibson, testified for the railway company:

"I was acquainted with George Nevitt. On the day of the accident he was at my house. . . . in the afternoon. . . . We left my house in my brother-in-law's Ford. . . . I drove the car. . . . When we entered Olive street we were about a block east of the railroad, then turned west. I was driving and Mr. Nevitt was with me. I was on the left hand side of the car. He was on the right hand side. There was only one seat in the car. It was a closed car. . . . I think the window on the north side was closed. We were driving along there about ten miles an hour. It was running in pretty good shape when I drove it across there. . . . At the rate we were going I could stop the car in about fifteen feet. As I drove along there I never looked up to see if the train was coming. Mr. Nevitt told me about it. That was after we got to the track. You can't see the railroad crossing as quick as you turn west, because a house is in the way. After we turned the corner there at Olive Street and started west toward the railroad I could see the railroad crossing. There was a crossing sign there. I could see that. . . . When we turned the corner there we were not quite half a block from the railroad crossing. I didn't look to see whether the train was coming until after we got by the house. I could see after we got by the house. I don't remember of looking to see if a train was coming, I might have. I never seen the train coming. I did not see Nevitt look. . . . I continued right on until I got on the track, at ten miles an hour. Mr. Nevitt cautioned me that a train was coming just as the train was on us, just as we got on the track. Before that he said something, it wasn't time for any train yet, something like that. He didn't tell me whether he looked or not. We were talking as we were driving along there. Neither one knew anything about a train coming until we were right on the track. The train was right on us when we drove on the track. Our car

Nevitt v. Railway Co.

didn't stall or anything like that. Went right on until the train hit us. All I seen was the engine head. I don't remember what hit me. I have no recollection of seeing the train any distance away from us up the track. Mr. Nevitt didn't mention seeing a train coming at any time before we got hit, except just before we were hit. I looked up, there was the train, and that is all. It was right on us. I had not heard it before that. . . .

"Cross-examination. I remember of testifying before that it was a little bit before we got on the track, before I saw the engine and sometime along there Mr. Nevitt said 'look out' or something like that, and started to get up to get out of the machine. The engine seemed to be going rapidly. Mr. Nevitt was trying to get out of the car. I remember that distinctly. Mr. Nevitt didn't tell me whether he looked or not as we approached the track coming up Olive Street, and I don't know whether he looked or not. . . .

"Redirect. If he looked he didn't say anything to me about it. If he looked he didn't tell me there was any train coming. He just mentioned the train, I don't know now just what he did say about that. We were just around the corner when he mentioned that. I never had no time to think about where I was at when Mr. Nevitt spoke about the train. I know I was awful close to the train when it hit me. We were nearer than ten feet to the track when he made that remark. If we hadn't been I would have stopped."

Nevitt apparently had succeeded in getting partly out of the enclosed car before the collision, as his body was flung free from it, while Gibson, the driver, was held fast in the wrecked automobile.

The jury returned a verdict for $4,000 in favor of plaintiff, and made special findings of fact:

"1. If deceased had looked at any time after he arrived within one hundred feet of the crossing would he have seen the train approaching? Ans. No.

"2. How far north of the crossing was the train of the defendant when it could have first been seen by the deceased? Ans. Six hundred feet.

"3. At what rate of speed did the deceased's driver run the automobile from the point where he could have seen the approaching train to the point of the collision? Ans. Seven to ten miles.

"4. At what distance from the crossing was the engine of the approaching train when the fireman first saw that the automobile was in such a position of peril that the driver could not stop in time to avoid the collision? Ans. Thirty feet.

"5. If you find for the plaintiff state specifically what act or acts, omission or omissions you find constituted the defendant's negligence? Ans. Excessive speed and neglect of fireman to notify engineer.

"6. If you find that the defendant by its agents, and employees ran its train wantonly upon the automobile of the plaintiff, state specifically and separately each act or omission of the employees of the defendant which you find have been wanton, wilful and reckless? Ans. Failure of the fireman to notify the engineer of the approaching automobile.

"7. At the rate of speed at which the automobile in which the deceased was riding was going could deceased have saved his life by getting out of the auto-

mobile before it was on the track if he had looked to see if a train was approaching? Ans. No.

"8. Could deceased have avoided the accident if he had looked and seen or heard the approaching train and warned the driver at any time before the automobile arrived at a point fifteen feet east of the crossing? Ans. No.

"11. Were the defendant's train crew guilty of a reckless and conscious disregard of the life of the deceased? If you answer yes, state specifically what acts or omissions constitute such reckless disregard? Ans. Excessive speed and neglect of fireman to notify engineer.

"12. At what rate of speed was the train running when it struck the automobile in which the deceased was riding? Ans. Fifty miles per hour."

Defendant's motions for judgment on the special findings, to set aside certain of the special findings, and for a new trial, were all timely presented and overruled; hence this appeal.

The defendant argues, first, that the evidence failed to prove that the excessive speed of the train was the proximate cause of the collision. This contention is not wholly correct. There were, it seems, two concurrent acts of negligence which brought about the death of Nevitt—the excessive speed of the train, and Gibson's driving of the Ford car on the track without assurance that it was safe to do so. It was negligence—or at least the jury might find that it was—to run the train at 50 miles an hour through a suburban district of a town like Winfield where there was probably a crossing at every block. Of course this negligence was not the sole cause of the accident, but it was one of the causes. It was a concurrent proximate cause. Gibson, the driver, was negligent also. He drove the car on the track without taking any precautions to assure himself of safety to himself and to Nevitt, his guest. (*Limbaugh v. Schaff, Receiver*, 114 Kan. 24, 28, 217 Pac. 279.) Now the law as to guests in an automobile is that they, too, must give due regard to their own safety at a railway crossing. (*Kirby v. Railway Co.*, 106 Kan. 163, 186 Pac. 744; *Knight v. Railway Co.*, 111 Kan. 308, 206 Pac. 893.) But there was very little evidence which would tend to show that Nevitt was negligent as to his own safety. And there was some plausible evidence that, considering the shortness of the time he had to act, he made an energetic effort to save his life. The space from where he could see an approaching train to the crossing, while not definitely fixed in the record, was very short. He could not possibly have seen the train for more than 8.1 seconds for it only swung into view at a distance of 600 feet and was travelling at 50 miles per hour. Nevitt had a duty to look to the south as well as to the north, which

would use part of that brief interval. Nevitt, so far as the record shows, had no reason to suppose the train would come at such excessive speed, nor had he any reason to suppose that Gibson would drive the car over the crossing ahead of the train. On the other hand there was some testimony and some circumstantial evidence that Nevitt was on the outlook for a train and that he made an effort to escape with his life. Apparently he had opened the door of the coupé and was partly out on the running board when he was hit. If the train had been running at moderate speed, as perhaps it should in that locality—a jury question—Nevitt would have had two or three seconds more to effect his escape, and would have saved his life.

Defendant contends that there is nothing in this case to differentiate it from the common run of automobile cases where the negligence of persons in crossing a railway track has barred recovery notwithstanding the negligence of the railway company. We think the case is analogous to *Schaefer v. Interurban Railway Co.,* 104 Kan. 394, Id. 740, 179 Pac. 323. It was there said:

"There is a somewhat different rule which applies to persons riding in a buggy or automobile who have no control of the vehicle. While such persons are charged with the duty of looking out for their own safety as far as practicable (*Bush v. Railroad Co.,* 62 Kan. 709, 64 Pac. 624; *Railway Co. v. Bussey,* 66 Kan. 735, 71 Pac. 261; *Bressler v. Railway Co.,* 74 Kan. 256, 86 Pac. 472; *Fair v. Traction Co.,* 102 Kan. 611, 171 Pac. 649; and Note in 54 L. R. A., n.s., 1915 B, 955 et seq.), yet they are not necessarily negligent merely because their driver is negligent. (*Williams v. Withington,* 88 Kan. 809, 129 Pac. 1148; *Denton v. Railway Co.,* 90 Kan. 51, 133 Pac. 558; *Denton v. Railway Co.,* 97 Kan. 498, 155 Pac. 812; *Corley v. Railway Co.,* 90 Kan. 70, 133 Pac. 555; *Burzio v. Railway Co.,* 102 Kan. 287, 171 Pac. 351.) . . .

"Was the deceased guilty of contributory negligence? Ordinarily that, too, is a jury question. The court cannot say as a matter of law that because the deceased could have seen the trolley car while she was 132 feet from the crossing, and while she was 82 feet from the crossing, and failed to warn the driver, that she was guilty of contributory negligence. Nor does the fact that she could have seen the trolley car at 11 feet from the track and that the Ford car could have been stopped in 4 feet make out a case of contributory negligence against the woman. It would take some slight interval of time, after getting within 11 feet of the track, to see the car, to recognize the danger, to determine what to do, to warn the driver, for the driver to realize the urgency of immediate action, and for him to stop the car. A jury could fairly conclude that there was insufficient time for such quick sequence of perception, thought, speech, and action." (pp. 398, 399. See, also, *Kessler v. Davis,* 111 Kan. 515, syl. ¶ 3, 207 Pac. 799.)

It is next urged that the jury's special findings are inconsistent with each other and some of them are in conflict with the general verdict.

Analyzing the special findings of fact, we do not find any demonstrated untruth in the answer to Question No. 1. The point of distance from the track at which Nevitt could have seen the train was not proved, unless the jury's view settled it, and this court cannot tell what the jury ascertained that distance to be. Nor is there any necessary conflict between Findings 1 and 2. At what point, other than squarely on the track, the train could have been seen 600 feet away is not shown. Touching Finding No. 5, the excessive speed was pleaded and proved. The neglect of the fireman was not pleaded nor proved, but that matter does not necessarily defeat the plaintiff. The same observation applies to Finding 6. The train was running at 50 miles per hour, which is 73⅓ feet per second, or 36⅔ feet in a half second. So the fireman (Finding 6) at 30 feet from the point of collision had less than a half second of time to notify the engineer after he realized that the negligent or foolhardy driver was not going to stop. There was therefore no support for the jury's finding of negligence on the part of the fireman, as set down in Findings 5, 6, and 11. But it is otherwise as to the findings of negligence touching the excessive speed of the train, Findings 5, 11 and 12; and these, together with the finding that deceased was not negligent, as reflected in Finding 7 and in the general verdict, have sufficient support in the evidence to sustain the judgment. At least, the evidence and special findings disclose no plain, palpable error which would permit this court to disturb the judgment. It is therefore affirmed.