### THE MANHATTAN, ALMA & BURLINGAME RAILWAY COMPANY v. R. A. STEWART.

1. WITNESS, *Inexpert and Incompetent.* A person not connected with the management of a train of cars, or having such experience in the running of trains and in checking their speed as entitles him to speak as an expert, is not a competent witness to answer "How long does it take to stop a train?"

2. STEAM WHISTLE; *Erroneous Instruction.* The statute provides that the steam whistle attached to an engine drawing a train of cars shall be sounded three times, at least eighty rods from the place where the railroad shall cross any public road or street, except in cities and villages; and in an action to recover damages for killing a colt at the crossing of a public road outside of a city or village, caused by the alleged negligence of the railroad company, an instruction that if the jury find from the evidence that the natural effect of sounding the whistle as done by the engineer was to drive the stock toward the track, then such whistling was negligence, is erroneous and misleading.

*Error from Riley District Court.*

ACTION brought by *Stewart* against the *Railway Company,* to recover the value of a mare alleged to have been killed by the defendant. This case has been here before. ( 27 Kas. 631.) After it was remanded for a new trial, another trial was had, at the December Term for 1882, of the district court. The court charged the jury as follows:

" 1. It is charged in the bill of particulars in this case that the defendant, the Manhattan, Alma & Burlingame railway company, did, about the 26th day of September, 1880, with an engine attached to a train of cars and operated by the employés of said company, carelessly and negligently run against a certain mare owned by the plaintiff, and did kill said mare.

" 2. The burden of proof is upon the plaintiff to establish by a preponderance of the evidence his right to recover.

" 3. The jury are the exclusive judges of the evidence — of its weight, and of the credibility of the witnesses.

" 4. It is admitted that the mare referred to in the bill of particulars was owned by the plaintiff, and was killed by being run over by a locomotive operated by employés of the defendant.

" 5. If then the jury find from the evidence that the mare was run over and killed through the carelessness or negligence of an employé or employés of the defendant company, they will find for the plaintiff, and assess his damages at the amount which they find from the evidence was at the time the value of the mare. Unless they do so find, their verdict will be for the defendant.

" 6. The law does not require an engineer to stop his train whenever he sees animals near the track, in anticipation of their coming upon the track; nor does it require him to slacken his speed unless there is reasonable cause to believe that they will get on the track, and he is not bound to slacken the speed if there is reason to believe that the animals will cross over in safety.

" 7. If you find that the engineer under the circumstances used ordinary care in managing his train, you will find for the defendant.

" 8. Ordinary care is such care as an ordinarily prudent person would use under similar circumstances.

" 9. It is not negligence to whistle to frighten stock from

the track; but if the jury find from the evidence in this case, that under the circumstances the natural effect of sounding the whistle as done by the engineer would be to drive the stock towards the track, then such whistling was negligence."

The jury found for the plaintiff, and assessed his damages at the sum of $90; and returned the following findings of fact:

"*Ques. 1:* What was the market value of the plaintiff's mare at the time she was killed? *Ans.:* Ninety dollars.

"Q. 2. Did plaintiff's mare come upon the track of defendant at a crossing used by the public as a highway? A. Yes.

"Q. 3. What means were used, if any, by those in charge of the defendant's train, to frighten the mare of the plaintiff away from the track? A. The sounding of the whistle.

"Q. 4. Did the plaintiff's mare, after the engineer of defendant first blew the whistle, stop and afterward start up again? A. No.

"Q. 5. At what distance was the mare from the track when she started the last time to cross the track — if she did start to cross a second time? A. The mare did not stop before crossing the track.

"Q. 6. How fast was defendant's train running at that time? A. At the rate of twenty-three miles an hour.

"Q. 7. Did the public road in which the mare was first seen run nearly parallel with the railroad for some distance? A. Yes.

"Q. 8. How often did the engineer blow the whistle before the mare came upon the track? A. He blew a succession of short whistles.

"Q. 9. Within what distance could such a train as the one in question upon such a track have been stopped? A. Within 150 yards.

"Q. 10. When the engineer saw that there was danger of collision with the mare, did he reverse his engine or blow the whistle, and were the brakes then put on? A. He blew the whistle.

"Q. 11. How many cars were there in the train, and were they loaded or empty? Was it a freight or passenger train? A. There were three cars: one flat car, one baggage car, and one passenger coach. The cars were empty. It was a mixed train."

Judgment being entered upon the verdict, the *Railroad Company* excepted, and brings the case here.

. *Geo. R. Peck*, and *W. C. Campbell*, for plaintiff in error.

*Spilman & Brown*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: Upon the trial, one Halloways, a witness for the plaintiff below, was asked the question, "How long does it take to stop a train?" The railway company objected to the question as incompetent and immaterial, and because the witness was not an expert. The objection was overruled, and the witness answered: "It takes about one hundred yards to stop a train." The purpose of the question was to establish the negligence of the company, and the plaintiff sought to show by the answer of the witness that the train was not stopped within the proper distance. Had the witness been interrogated concerning the rate of the speed of the train, he might have been permitted to answer, as any intelligent person who is accustomed to observe moving objects would be able to express an opinion of some value upon it the first time he ever saw a train in motion. But the question objected to was one which could only be answered by a person of experience in the running of trains and in checking their speed, or by one who had such opportunities as entitled him to speak as an expert. The objection, therefore, should have been sustained, as the witness was incompetent to answer.

It is insisted, however, that as Halloways was an eye-witness of the accident and its attending circumstances, and as he lived in the immediate vicinity and had frequently seen trains stopped, that what he testified to related to a matter of observation. We cannot consent to this view. The witness was not asked how long it would take to stop the train which committed the injury complained of, nor was he asked in giving his answer to take into consideration the velocity of the train, the grade of the track where the injury was committed, or any other circumstance connected therewith. As

asked and answered, the question does not belong to that class which relates to experience and observation as to affairs of every-day life, to which the attention of all is directed, and of which all are competent to speak.

Further, it is urged that this evidence was not prejudicial, on the ground that another witness, more familiar with the circumstances, testified in the same manner without objection. Upon examination of the record we find that this statement is not fully sustained. Allen, the witness referred to, was not asked "How long does it take to stop a train?" but did testify, "I give the signal, and they [the trains] generally stop in one hundred yards." He testified to a fact coming under his observation, but gave no opinion.

In the direction to the jury the court charged: "It is not negligence to whistle to frighten stock from the track; but if the jury find from the evidence in this case that under the circumstances the natural effect of sounding the whistle as done by the engineer would be to drive the stock toward the track, then such whistling was negligence." This instruction is erroneous. Sec. 60, ch. 23, Comp. Laws of 1879, provides:

"A steam whistle shall be attached to each locomotive engine, and be sounded three times, at least eighty rods from the place where the railroad shall cross any public road or street, except in cities and villages, under a penalty of not more than $20 for every neglect of the provisions of this section, to be paid by the corporation owning the railway, on the suit of the county attorney, one-half thereof to go to the informer, and the other half to the county for the support of common schools; and the corporation shall also be liable for all damages which shall be sustained by any person by reason of such neglect."

As the public road crossed by the train was outside of any city or village, the engineer was under duty to sound his whistle three times, at least eighty rods from the place where the railroad crossed the public road; and if he had omitted this duty, he would be guilty of negligence. (*Railroad Co. v. Phillippi*, 20 Kas. 9.) The findings show that the animal

killed did not stop after the engineer first blew the whistle. The instruction did not attempt to separate the sounding of the whistle, in compliance with the statute, from any subsequent or unnecessary whistling, and the jury should not have been thus misdirected. Upon the evidence produced by the plaintiff below, the negligence of the engineer, if any, was in increasing the speed of the train after it had slacked up, when the animal started to run along the track.

John Tull testified that "The animals would all have reached the crossing in time to have crossed ahead of the train, if the train had kept right along at the speed it was going, after it slacked up and before starting up again."

The judgment of the district court will be reversed, and the cause remanded.

All the Justices concurring.