No. 35,930

Cleo Richards and Hazel Richards, Father and Mother and Next of Kin of June Richards, Deceased, *Appellants,* v. The Chicago, Rock Island & Pacific Railway Company, Frank O. Lowden and Joseph B. Fleming, as Trustees, etc., *Appellees.*

(139 P. 2d 427)

Opinion filed July 10, 1943.

*Evart Mills,* of McPherson, argued the cause for the appellants.

*Clayton M. Davis,* of Topeka, argued the cause, and *J. E. DuMars,* of Topeka, and *James L. Galle,* of McPherson, were on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, J.: Plaintiffs brought this action for the alleged wrongful death of their daughter, June Richards. The trial court sustained a demurrer to their evidence and they have appealed.

Defendant's railroad runs north and south through the city of McPherson and is intersected at right angles by Skancke street, an east-and-west street. At this intersection defendant has four tracks. Counting from the west, and giving distances from center to center, these are: *First,* the stock track; *second,* east 34½ feet is the "long" track; *third,* east 13½ feet is the "passing" track; *fourth,* east 13½ feet is the main-line track. At the time in question a boxcar was standing on the first track 29 feet south of Skancke street, and on the second track, beginning 75 feet south of Skancke street, there were three or more oil tank cars. There were no cars standing on the third or fourth tracks. One standing in the center of the first track, looking southeast, could see a train approaching from the south on the fourth track 135 feet south of Skancke street; and if standing in the center or on east rail of the second track, looking south, could see a train approaching on the fourth track for a distance of approximately 1,000 feet. South of Skancke street there is no street crossing the railroad until Avenue A, four blocks south. The depot is a block and a half or two blocks north of Skancke street. Skancke street is a dirt street which once had a little gravel on it. The traveled portion is about 16 feet wide, and 16-foot planks are laid on each side of the rails of the several tracks, longitudinally.

Plaintiffs had lived for a year and a half a block east and a block

south of the intersection. They had two daughters—June, 18, and Cleo, 16. The girls drove the family car and frequently drove across this intersection.

Merle Hungerford, 17 years of age, lived at Canton, and had permission to drive his father's car, a 1930 model A Ford two-door sedan. He and Wendell McNees, a year younger, who lived in Canton, had a date with the Richards girls for Sunday evening June 28, 1942. That afternoon they put mud guards on the car and tightened the brakes. The engine and brakes were in good working order. A V-shaped piece was broken out of the righthand front glass window, the left front window appears to have been broken out, the windshield wipers were not working, the muffler hood was loose, and the car was rather noisy. It had rained that afternoon and showers occurred intermittently later. The boys reached the Richards' home about six o'clock and the four young people drove about town, Cleo riding in the front seat with Hungerford, who was driving, and McNees riding in the rear seat with June. While riding about town there came a shower of rain and they concluded to drive back to the Richards' home. Because rain was coming in the front seat, Cleo Richards got out of the front seat and into the rear seat and sat on the lap of her sister June. While riding in this manner across defendant's tracks on Skancke street their car was struck by a passenger train coming from the south on the fourth track, with the result that June Richards was killed.

The testimony of the surviving members of the party was to this effect: Merle Hungerford testified he had been driving a car for four years and this one for six months; he had traveled over the crossing frequently, was familiar with it, knew there were four tracks, and that the east one was the main-line track. He was traveling at 15 to 20 miles per hour, and may have slowed to about 13 or 14 miles per hour. His judgment was that he could have stopped his car in 20 feet. When he drove onto the first track he looked to the south and saw no train coming on the main track. Some rain was falling and drops clung to the windshield. He then looked to the north, and while he was looking to the north someone in the back seat screamed. He then looked to the south and a train on the east track was approaching about 45 feet away. "I tried to beat it on across." The train struck his car on the right side near or a little in front of the rear wheel. He testified that had

he looked to the south as he crossed the second track he could have seen the train in time to stop.

Wendell McNees testified that as they approached the intersection "I looked to the south and I didn't see any trains and looked to the north and I saw no trains and one of the girls screamed and hollered 'There is·a train.'" When he first looked to the south "it was· maybe just before we got to the first track there." We ceased looking to the south "when maybe the back wheels were just going over the track." When he looked back to the south the car was on the second track from the east, traveling about 15 miles per hour, and the train was then about 60 feet away. Had he looked to the south as he was crossing the second track he could have seen a train coming from the south on the main track, "maybe a thousand feet."

Cleo Richards testified that she remembered looking and listening for a train. She looked south when they were going across the first track. Her reason for looking to the south was that trains coming from the south come in faster than the ones from the north. They are just leaving the depot and are not quite so fast. When she saw no train coming from the south she looked directly ahead of her to see whether there was a car coming from the east, because it was raining and it was pretty hard to see. She looked to the south again when they were between the second and third tracks, and she said, "Be careful, there is a train." She thinks she did not scream. The next thing she remembered was being in the hospital.

Other witnesses called by plaintiffs, who lived near by, saw the train, heard it whistle, and heard the exhaust from the engine for several blocks before it reached Skancke street.

In the petition plaintiffs pleaded a city ordinance prohibiting a steam railroad from operating a train into or through the city at a speed in excess of 20 miles per hour and providing penalties for its violation in the way of fines. Several witnesses testified to the speed of the train, giving their judgment that the speed was 30 or 35 or 40 miles per hour.

Plaintiffs allege defendant was negligent: (a) In operating its train at a speed in excess· of the city ordinance. This will be treated later. (b) In operating the train at an excessive speed when the rain was falling and when the view of persons coming from the west on Skancke street was limited by the boxcars on the switch

track. (c) By leaving cars on the switch track close to the street, which impaired the view of travelers of the approaching train. (d) Failure to maintain electrical or mechanical warning signs at the crossing. (e) That defendant neglected to sound any whistle or ring a bell when the train was approaching. The evidence did not support this ground of negligence.

No facts were alleged and there was no evidence tending to show that defendant was negligent for failing to maintain electrical or other mechanical warning signs at this crossing. (See G. S. 1935, ·68-414.) The fact defendant had some cars standing on the switch track did not constitute negligence of defendant. That is one purpose of having such tracks. Neither does the fact that rain was falling impute negligence to defendant.

There is testimony in the case from which the jury might have found that the speed of the train was 35 miles per hour. This is conceded. It is the only thing worthy of discussion tending to show negligence of defendant. Arguing this point, counsel for appellants contents himself by citing *Griffith v. Atchison, T. & S. F. Rly. Co.,* 132 Kan. 282, 295 Pac. 687, where a breach of the city ordinance was shown, but liability for damages denied. The pertinent syllabus reads:

"Rule followed that while the breach of a city ordinance by a railway company operating within its corporate limits is negligence *per se,* yet no civil liability in damages can be imposed on the railway company therefor unless the breach was the proximate cause of the loss or injury upon which the claim for damages is predicated."

In the opinion (p. 286) the court said:

"While the breach of a city ordinance by a railway company is negligence *per se,* liability in damages cannot be predicated on its violation unless the breach of the ordinance is the proximate cause of the injury and damage, or substantially contributes thereto. (*Williams v. Electric Railroad Co.,* 102 Kan. 268, 271, 170 Pac. 397; *Cooper v. Railway Co.,* 117 Kan. 703, 232 Pac. 1024; *Whitcomb v. Atchison, T & S. F. Rly. Co.,* 128 Kan. 749, 751, 280 Pac. 900.)"

It is difficult to see how the speed of the train, considered by itself, could have any direct bearing upon the collision here involved. Certainly, the speed of the car in which the young people were riding and the speed of the train would have to be considered in their relation to each other. If either one of them, and one only, had been going much faster or much slower than it was the collision would not have occurred. So, the train might have been moving 60 or 70 miles per hour, violating the ordinance to a greater extent

than it was, and been entirely past the intersection before the car reached it, and no collision would have occurred. Or, it might have started earlier and passed the intersection first, at not more than 20 miles per hour; or started later and not have reached it. The speed of the car might have been faster or slower, or it might have started sooner or later than it did, and the collision would not have occurred, even though the speed of the train would have been what the evidence here shows. So, the speed of the train in excess of the ordinance is not sufficient to establish liability. In *Vance v. Union Pac. Rld. Co.*, 133 Kan. 11, 298 Pac. 764, it was held:

"To entitle one to damages caused by a railroad train running through a city at a higher rate of speed than is prescribed by a city ordinance, he must show that the violation was the proximate cause of the injury and loss."

And in *Williams v. Electric Railroad Co.*, 102 Kan. 268, 166 Pac. 508, the rule was thus stated:

"A breach of a speed ordinance of a city by an interurban trolley car is negligence *per se*; but to subject the owner of the trolley car to liability for the violation of the city ordinance, in a damage suit by a private litigant, it must appear that the disobedience of the ordinance caused or aggravated the damages."

This last case is cited, with many others in support of the text, in 52 C. J. 276, where it is said:

". . . a railroad company is not liable on the ground that the train was operated at an unlawful, or otherwise excessive, speed where such operation is not the proximate cause of the injury for which recovery is sought, . . ."

We think it clear the proximate cause of the collision in this case was the negligence of the driver of the car and those riding with him. The three survivors of the casualty were the only witnesses who testified as to how the car was operated on the crossing and what attention was given to approaching trains. The driver testified that he crossed the intersection at 15 to 20 miles per hour and may have slowed a little; that he thinks he could have stopped his car in 20 feet; that he looked first to the south, and seeing no train, looked to the north, and did not look to the south again until the train on the east track was within 45 feet of the crossing (in a statement made to a railroad representative he had placed the distance at 20 feet); that he then tried "to beat it on accross." He said if he had looked to the south when he had crossed the second track he could have seen the train approaching, but he did not look.

McNees' testimony was that he looked first to the south; seeing no train, looked to the north, and did not look again to the south

until they were practically upon the fourth track. Just why these two men could not have divided their. responsibility and one of them looked to the north and the other to the south continuously is not disclosed. We take their evidence as they gave it.

Cleo Richards seemed more alert than either of the young men. She looked to the south because she knew that the trains from the south usually crossed the intersection at greater speed than those from the north. The evidence indicates the young men knew that also. After first looking to the south she realized the likelihood that there might be an automobile approaching on the narrow street, and from the rear seat looked as best she could through the rain-spattered windshield to see if a car were approaching. Being satisfied there was none, she turned her attention again to the south. Seeing the train' coming she advised the other occupants of the car .of that fact. In 52 C. J. 320, the pertinent rule is stated as follows:

"Where a traveler about to enter upon a crossing has the opportunity, by exercising his sense of hearing or sight, to discover an approaching train in time to stop in a place of safety, it is his duty under such circumstances to look and listen, and if he fails to do so, or fails or neglects, as he approaches the crossing, to see or discover an approaching train dangerously near the crossing which, the evidence shows, he could or must have discovered had he looked or listened, such failure to look or listen or to look and listen or to heed what he sees or hears ordinarily is held to constitute contributory negligence as matter of law, although the circumstances of the particular case may be such as to make it a question which should be submitted to the determination of the jury."

In *McCune v. Thompson,* 147 Kan. 57, 59, 75 P. 2d 294, it was said:

"It has long been settled law in this state, as throughout this country generally, that a railway track is itself a warning of danger. (*Bazzell v. Atchison, T. & S. F. Rly. Co.,* 134 Kan. 272, 5 P. 2d 804.) A person about to cross a railway track must first assure himself that no train is approaching and that it is safe to cross. If he attempts to cross without first making sure that he can safely do so, he is guilty of negligence, and he will not be permitted to penalize the railway company if an accident occurs. Our own reports are laden with decisions to this effect. The older cases were collated by the late Mr. Justice Marshall in *Jacobs v. Railway Co.,* 97 Kan. 247, 154 Pac. 1023, and *Wehe v. Railway Co.,* 97 Kan. 794, 156 Pac. 742." (See, also, many other of our cases cited later in the opinion.)

Normally, what constitutes the proximate cause of the injury is a jury question, but where the facts are agreed upon, or not in dispute, it becomes a question of law. See *Smith v. Mead Construction Co.,* 129 Kan. 229, 282 Pac. 708, and authorities there cited. See, also, 45 C. J. 1320.

Quite a little is said in the briefs of counsel about the contributory negligence of June Richards. However, if we are correct, as we think we are, in holding, as we do, that the proximate cause of the collision was the negligence of the driver of the car in which she was riding and others, aside from herself, whose duty it was to keep a lookout, the question of whether she, personally, was guilty of contributory negligence becomes immaterial.

We find no error in the ruling of the trial court. Its judgment, therefore, is affirmed.