No. 40,691

DONALD F. KENDRICK, *Appellant*, v. THE ATCHISON, TOPEKA & SANTA FE RAILROAD COMPANY, *Appellee.*

(320 P. 2d 1061)

Opinion filed January 25, 1958.

*John C. Frank,* of Wichita, argued the cause and *Robert L. Morrison,* of Wichita, and *George Templar, Earle N. Wright, Ted Templar,* of Arkansas City, were with him on the briefs for the appellant.

*W. E. Treadway* and *Edwin M. Wheeler,* both of Topeka, argued the cause and *Kirke W. Dale, Donald Hickman,* both of Arkansas City, and *C. J. Putt, J. B. Reeves,* of Topeka, were with them on the briefs for the appellee.

The opinion of the court was delivered by

HALL, J.: This is an appeal from an order sustaining the demurrer to the plaintiff's evidence in a railroad crossing case.

The plaintiff Kendrick and others, Charles Manley, Tolliver Matthews and Milton McCollum were residents of Winfield, Kansas, employed at the Boeing Airplane Company in Wichita, Kansas. They had a car pool arrangement whereby the four of them alternated in driving their automobiles from Winfield to Wichita.

On the afternoon of December 15, 1955, they were en route to the plant in Wichita where their work commenced at 3:45 p. m.

On this particular day Charles Manley was driving his car and the plaintiff Kendrick, Tolliver Matthews and Milton McCollum were passengers. The plaintiff sat in the rear seat to the left immediately behind the driver Manley. Matthews sat to the right in the rear seat and McCollum to the right in the front seat.

Manley, the driver, followed their usual route from Winfield to Wichita by taking U. S. Highway 77 north from Winfield to the junction of Kansas Highway 15 thence west to Wichita on K-15.

The Atchison, Topeka & Santa Fe Railroad operates a line from Winfield northward to points east and west. From Akron, Kansas, a small town north of Winfield to the junction of US-77 and K-15, a distance of some 2½ miles, highway 77 and the Santa Fe Railroad track are parallel.

Northbound US-77 connects with westbound K-15 by a wide, gradual curve approximately 1,760 feet in length. This curve merges into westbound K-15 appoximately 490 feet east of a railroad

crossing over K-15. The highway and crossing are substantially at right angles.

At approximately the point where the curve from US-77 joins K-15, approximately 490 feet east of the crossing, there are the usual "hazard type warning signs." There were additional cross-arms signs on each side of the crossing.

Along the track, at a point approximately 1,320 feet south of the crossing, there was a whistle post for northbound trains approaching the crossing.

The accident occurred when a Santa Fe train proceeding in a northerly direction and the automobile driven by Charles Manley proceeding in a westerly direction on K-15 collided at the crossing. Manley was killed and the plaintiff suffered injuries for which this suit was brought.

The plaintiff Kendrick brought suit against the estate of the driver, Charles Manley, and the Santa Fe Railroad. The cases were consolidated for trial. At the close of the plaintiff's evidence both defendants demurred to the evidence. The demurrer of the defendant Santa Fe Railroad was sustained and the demurrer of the Manley estate was overruled.

In support of his petition the plaintiff gave his own testimony and the testimony of Matthews, one of the passengers in the car; Roy Snook, another employee at Boeing who commuted from Winfield and who was riding with his son Eugene Snook, Joe Hanna and others at a point about 500 feet on the curve behind the Manley car when the accident occurred; Eugene Snook and Joe Hanna; Lawrence O'Hara, who lived on a farm in Butler County and who at the time of the accident was at a stop sign on the north approach to K-15 about 150 feet east from the crossing; Lester Koch and Marvin LaFollette, Kansas State Highway Patrolmen who investigated the accident; James Desbein assistant county engineer; and several other witnesses who testified as to plaintiff's injuries which are not material to the issues raised in this demurrer.

Desbein testified as to the physical aspects of the highway and the railroad track. He had measured the distance from the highway to the whistle post and found it to be 1,320 feet.

Plaintiff Kendrick testified that Manley was driving about 60 or 65 miles per hour as he proceeded northward on US-77; that as they proceeded he did not see or hear the Santa Fe train. He said:

". . . I first noticed the Santa Fe train when I was in the circle of

K-15 (the curve was also known as the circle) and when our car was in a northwesterly direction, . . .

. . . . . . . . . . . .

". . . I traveled to work by car and had entered into a car pool with Charles Manley, Tolliver Matthews and Milton McCollum . . . That way it saves expenses on all cars, to have to drive them back and forth every day. Boeing had to approve the car pool. Each of the boys took his car on alternate days.

"Charles Manley had a reputation as a very good driver. He was a very careful driver. He observed all the traffic signs. He drove within the speed limits of the State laws. When the other fellows drove their cars, none of the riders had control over the manner in which he drove, nor the route taken, nor the speed at which he drove.

. . . . . . . . . . . . .

". . . The window on my side was about five or six inches down when I first saw the train. The radio in the car was not on, and there was no noise in the car. When I first saw the train, it was somewhere around the whistle post. I do not know exactly where it was. I had to sort of look over my left shoulder to see the train. I could not see the train by just looking out the side window. I had to turn and look back. Up to this point, I did not know there was any train on the Santa Fe tracks.

"Just as Mr. Manley started off the curve, he stepped on the gas a little more, . . . Mr. Manley accelerated the speed of the car, . . . at the end of the curve, . . . When Mr. Manley increased the speed of his car on the curve, I gave a warning. . . . Mr. Manley increased the speed of his car. I warned him that there was a train on the track up ahead. I yelled out. Mr. Manley turned around and wanted to know what we were wanting to stop for, what we had hollered about. I warned him again. Mr. Manley turned around and then after a few seconds, hit the brakes. During this time, all three of us kept warning him. There was a squeal of brakes, and we almost got stopped, and then hit the train.

"Coming from Akron to the circle, we were doing about 60 to 65 miles per hour, and in the circle we were doing 10 to 15 miles less. . . . It is over 400 feet from the railroad crossing hazard signs to the railroad tracks. When I first gave the warning, I could see down the railroad tracks to the Clark house. There was nothing to obstruct the driver's view. At no time up to the point that I saw the train had I ever heard the train whistle. At no time while I was in the curve did I hear the train whistle. I did not hear the train whistle at any time.

"The train was going faster than we were. . . ."

Matthews' testimony corroborated generally with that of Kendrick. He also testified:

". . . The first time I saw the train we were in the curve part of K-15, and I had not seen the train before that day, nor had I heard the whistle. When I first saw the train I would say we were a little past middle ways of the curve. Up to the time I saw the train I had never heard it whistle. As we started out of the curve, Mr. Manley started speeding up, and I knew he

hadn't seen it at that time, so I hollered, 'Stop it' and he turned around and said, 'Huh, what do you want to stop for', and I told him 'There's a train on the track,' and about that time Donald (Kendrick) said 'There's a train on the track,' and it seemed he didn't see it then for a while and he went on down a little ways and I even pointed the train out to him.

". . . We were someplace past the railroad hazard boards when I pointed the train out to him. We had warned him twice, three times, something like that, . . .

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. Well, after I showed him the train he turned back around then and went a little further and I didn't know whether he was taking his time to get his foot on the brake or what, but anyway I didn't think he was ever going to hit his brakes. But he finally got onto them and after he got on his brakes we all quit hollering then and knew he was doing the best he could.

"I thought he was going to get the car stopped there at one time. At the most I would say that we weren't going more than 10 miles an hour at the time we hit the train. It looked like we were going to get stopped. The train never slackened up from the time I saw it. I never did hear the train whistle. I have heard the train whistle before, and I think I could hear it whistle, I don't know, a mile away. From the first time I saw the train that day until the collision, it never slackened its speed."

Roy Snook testified:

". . . The Manley car was about a quarter of a mile ahead of us when I first saw it. . . . When the Manley car collided with the train, we were immediately behind him on the straight-of-way.

"As we rounded the curve, I saw the train on the Santa Fe tracks. We first saw the train when we pulled out of Akron. We were watching it all the way up the track, and saw it all through the curve. I don't know how far it was from the crossing, but it was off to the south when we pulled onto K-15. I know where the whistle post is there. I have seen it. I had the train under observation when it was by the whistle post, and clear up to the time it crossed K-15. There was no audible sound emanated from the train. . . . We were traveling faster than the train. I did not hear any sound from the locomotive of the train from Akron up until the time of the impact. I did not at any time hear a whistle or bell from the train.

"We were driving around 70 miles an hour. I would say the train was doing somewhere between 60 and 65 miles an hour. I don't think the train reduced speed at any time immediately before the impact.

"I saw the tail lights go on the Manley car when he set his brakes approximately 50 feet or a little more before they hit."

Eugene Snook's testimony was substantially the same as his father's, Roy Snook. He also said:

". . . As we came out of the curve, I could see the Manley car's stop lights go on and the front end of the car go down. I thought for a while he was going to make it.

"I saw the train on the Santa Fe tracks when I was half way through the curve on K-15. I did not at any time hear the train give any audible warning of its presence. It didn't look like the train tried to slacken its speed until right at the intersection."

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Describe the impact between the car and the train and what happened to both of them immediately thereafter.

"A. Well, the Manley car was just about going down the center line of the highway I believe when he hit  .  .  .  right in front of the rear trucks of the train.

"Q. Where would that be with reference to the front and back of the train?

"A. The back of the train."

## Joe Hanna testified:

".  .  .  We had just come out of the curve when the train and the Manley car collided. I did not hear any audible sounds from the train and did not hear any whistle or bell.

"I would say the train was going about 60 to 65. The tail light of the Manley car was on just a few seconds. I thought he was going to be able to stop."

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. What, if anything, did you observe about the Manley car after you saw it when it was straight west of you?

"A. I told the riders, 'That guy is going to hit that train.' "

## Lawrence O'Hara testified:

"I am familiar with the train that travels along there about that time of day that is sometimes called the Doodlebug. I have seen it quite often. I have heard the train whistle lots of times. I could hear it something like a half mile or more back down K-15. I had my window down, so that I could see the traffic clearly. It was down at the time of the collision. I did not hear the train whistle. I did not hear any bell or whistle at any time while I was parked there."

## Lester Koch, a Highway Patrolman testified:

".  .  .  We found a set of skid marks. They commenced 78 feet east of the railroad tracks and stopped at the railroad tracks or about a foot east of the railroad tracks."

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Did you at any time see any members of the train crew there?

"A. Yes sir, there was one member of the train crew there, I ain't for sure, but I think it was the conductor.

"Q. Did you attempt to ascertain from him what happened?

"A. Yes sir.

"Q. And what, if anything, did he tell you?

"A. All he told me was that he saw the car about, he figured about the same time the car seen him, and he said he couldn't get stopped, and I asked him if he blowed the whistle and he said yes.

"Q. Was there any further comment about it?

"A. Not from me, no.

"Q. He didn't state when he blew the whistle or how long or anything of that kind?

"A. No sir.

Marvin LaFollette, a Highway Patrolman testified:

"The car was laying in the ditch on the righthand side of the railroad track, and quite a bit of damage was done to it. The motor car was approximately a half mile down the track."

. . . . . . . . . . . . . .

"Q. What did he (the conductor) tell you about the accident?

"A. I had started down the railroad track to the motor car which at that time was stopped and I met the conductor coming back and then we both proceeded back to the scene of the accident.

"Q. Did you ask him what had happened?

"A. Yes.

"Q. What did he tell you?

"A. Well, I asked him if he would care to make a statement and I believe his words were, I don't remember exactly, he would rather not until he talked to the officials, and then they would make an official statement."

In ruling on the demurrer the court said:

" 'By the Court: The Santa Fe's demurrer is sustained primarily on the basis of the case in 171 Kansas, 403 [Harmon v. Atchison, Topeka & S. F. Rly. Co.], the Santa Fe motor coach was lawfully occupying the crossing, that the plaintiff was as a matter of law contributorially negligent.' "

Upon a demurrer to the evidence this court is called upon to review only the sufficiency of plaintiff's evidence and not to weigh the evidence for the purpose of rendering a decision on the merits of the action, and this same duty was incumbent upon the trial court. The rule is so well established in this and other jurisdictions that it would not be necessary to reiterate that in testing the sufficiency of evidence as against a demurrer, the court shall consider all of plaintiff's evidence as true, shall consider that favorable to plaintiff, together with all reasonable inferences to be drawn therefrom, and disregard that unfavorable to plaintiff, and shall not weigh any part that is contradictory, nor weigh any differences between his direct and cross-examination, and give the evidence of plaintiff a liberal construction resolving all doubt against defendant and, if so considered, there is any evidence which supports or tends to support plaintiff's case on any theory, the demurrer shall be overruled. A few of our more recent cases adhering to this rule are: *In re Estate of Dieter,* 172 Kan. 359, 239 P. 2d 954; *Staab v. Staab,* 160 Kan. 417,

163 P. 2d 418; *Palmer v. The Land & Power Co.*, 172 Kan. 231, 239 P. 2d 960; *McCracken v. Stewart,* 170 Kan. 129, 223 P. 2d 963; *Fry v. Cadle,* 171 Kan. 14, 229 P. 2d 724; *Blankenship v. Fraker,* 173 Kan. 438, 439, 249 P. 2d 683; *Revell v. Bennett,* 162 Kan. 345, 176 P. 2d 538; *Huggins v. Kansas Power and Light Co.,* 164 Kan. 27, 187 P. 2d 491; *Gabel v. Hanby,* 165 Kan. 116, 193 P. 2d 239; *Samms v. Regier,* 167 Kan. 556, 207 P. 2d 414; *Hukle v. Kimble,* 169 Kan. 438, 441, 219 P. 2d 434; *Schneider v. Stewart,* 170 Kan. 158, 163, 223 P. 2d 698; *Cain v. Steely,* 173 Kan. 866, 252 P. 2d 909; *Siegrist v. Wheeler,* 175 Kan. 11, 259 P. 2d 223; *Messinger v. Fulton,* 173 Kan. 851, 252 P. 2d 904; *Hill v. Southern Kansas Stage Lines Co.,* 143 Kan. 44, 53 P. 2d 923; *Worrell v. West,* 179 Kan. 467, 296 P. 2d 1092; *Noel v. Menninger Foundation,* 180 Kan. 23, 299 P. 2d 38; *Jones v. Winn,* 179 Kan. 587, 297 P. 2d 199; *Harvey v. Palmer,* 179 Kan. 472, 296 P. 2d 1053; *Brent v. McDonald,* 180 Kan. 142, 300 P. 2d 396; *Cosby v. Doskocil,* 180 Kan. 367, 303 P. 2d 1107; *Koch v. Suttle,* 180 Kan. 603, 306 P. 2d 123; *Boggs v. City of Augusta,* 180 Kan. 831, 308 P. 2d 72; *Jameson v. Farmers Mutual Automobile Ins. Co.,* 181 Kan. 120, 309 P. 2d 394; *Haqa v. Moss, Administrator,* 181 Kan. 171, 311 P. 2d 281; *Witmer v. Estate of Brosius,* 181 Kan. 200, 310 P. 2d 937; *Hamilton v. Ferguson,* 181 Kan. 474, 312 P. 2d 232; *In re Estate of Modlin,* 172 Kan. 428, 241 P. 2d 692; *Coleman v. Patti Construction Co.,* 182 Kan. 53, 318 P. 2d 1028. Other cases holding to the same effect may be found in 5 Hatcher's Kansas Digest [Rev. Ed.], Trial, § 151, and West's Kansas Digest, Trial, § 156 (2) and (3).

The lower court relied on *Harmon v. Atchison, Topeka & S. F. Rly. Co.,* 171 Kan. 403, 233 P. 2d 489 in deciding that the train was lawfully occupying the crossing and the plaintiff was guilty of contributory negligence as a matter of law.

This case is not authority for either proposition. True, it was an action for damages sustained by a plaintiff in a crossing accident and who was riding as a passenger in an automobile. The plaintiff alleged several different grounds of negligence on behalf of the railroad. The court considered thoroughly each ground and determined that the plaintiff's evidence failed to sustain the allegations and that no actionable negligence had been shown.

The contributory negligence of the plaintiff was not even considered by the court. The court said:

"The result of this analysis is that there was no substantial, competent evidence to establish negligence of the defendant.

"There is not much else to this lawsuit. Defendant in its answer did not plead contributory negligence of plaintiff, but after she had testified that was included as a ground for the demurrer to plaintiff's evidence. Much of the brief, particularly the brief of appellee, is devoted to this question. In view of our conclusion that plaintiff's evidence shows no actionable negligence of defendant it is not necessary to discuss plaintiff's contributory negligence, and we base no decision thereon." (p. 412.)

The negligence relied on by the plaintiff in this case was the failure of the train to sound its whistle as provided by statute.

G. S. 1949, 66-2,120 provides as follows:

"A steam whistle shall be attached to each locomotive engine, and shall be sounded four times (two long and two short blasts) at least eighty rods from the place where the railroad shall cross any public road or street, except in cities and villages, . . . and the corporation shall also be liable for all damages which shall be sustained by any person by reason of such neglect: . . ."

A similar contention was made in the Harmon case but the court said:

". . . The contention that defendant failed to use the whistle was thoroughly disproved by the testimony of the witness Bybee, called by plaintiff. He testified not only that the whistle was blowing, but that the bell was ringing." (p. 412.)

This case presents an entirely different situation. Here the plaintiff had six witnesses, including several disinterested ones, who testified the train did not whistle or at least they did not hear it whistle. The only contrary evidence was the testimony of a highway patrolman who quoted the engineer as saying he blew the whistle. Under the above rule on demurrer all such conflicts must be resolved in favor of the plaintiff.

This case also does not present the question of the lawful right of a train to occupy a crossing as in the Harmon case. This case presents the question of the negligence of a train in failing to sound a whistle at a crossing, whether any failure to do so is the proximate cause of the accident and plaintiff's injuries, and whether the plaintiff is barred by any contributory negligence.

Did the plaintiff's evidence meet these elements of recovery?

G. S. 1949, 66-2,120 has been on our statute books since 1868. Since the early case of *Leavenworth, L. & G. R. Co. v. Rice,* 10 Kan. 321 [2nd Ed.], our court has held steadfastly to the rule that the failure to give the signals as required by this statute is negligence and later cases made it negligence *per se. (M. A. & B. Rly.*

Co. v. Stewart, 30 Kan. 226, 2 Pac. 151; *Clark v. Mo. Pac. Rly. Co.,* 35 Kan. 350, 11 Pac. 134; *Mo. Pac. Rly. Co. v. Stevens,* 35 Kan. 622, 12 Pac. 25; *A. T. & S. F. Rld. Co. v. Townsend,* 39 Kan. 115, 17 Pac. 804.)

And this is the general rule in other jurisdictions with similar statutes. (*Baltimore & O. R. Co. v. Joseph,* 112 F. 2d 518; *Hobbs v. Union Pacific R. R. Co.,* 62 Ida. 58, 108 P. 2d 841; *Busker v. New York Cent. R. Co.,* (Mo. App.) 149 S. W. 2d 449; *Moore v. Atlantic Coast Line R. Co.,* 192 So. C. 406, 7 S. E. 2d 4.)

The rule was well expressed in *A. T. & S. F. Rld. Co. v. Townsend,* supra.

"It is negligence *per se* for the railroad company to fail to sound the whistle eighty rods from a public crossing, but it does not excuse a traveler from using care and caution to avoid injury at such crossing." (Syl. 2.)

To these authorities may be added those which hold the violation of a city ordinance by railroads constitutes negligence *per se.* (*Williams v. Electric Railroad Co.,* 102 Kan. 268, 170 Pac. 397; *Cooper v. Railway Co.,* 117 Kan. 703, 232 Pac. 1024; *Griffith v. Atchison, T. & S. F. Rly. Co.,* 132 Kan. 282, 295 Pac. 687; *Whitcomb v. Atchison, T. & S. F. Rly. Co.,* 128 Kan. 749, 280 Pac. 900; *McCausland v. File,* 141 Kan. 120, 40 P. 2d 323; *Richards v. Chicago, R. I. & P. Rly. Co.,* 157 Kan. 378, 139 P. 2d 427.)

The purpose of these statutes is to warn of approaching trains and not of trains already occupying the crossing. (*Corkhill v. Thompson,* 169 Kan. 38, 217 P. 2d 273.)

Appellee cites *Williams v. Railway Co.,* 100 Kan. 336, 164 Pac. 260, to the contrary. In that case the court did not disturb the rule of negligence *per se* for failure to sound the whistle but said the failure to do so on the facts there, was not the proximate cause of the injury.

Appellee contends the demurrer should be sustained because the evidence failed to prove actionable negligence on the part of the railroad in these particulars: There was nothing to obstruct the view of persons on the highway of approaching trains; there was no defect in the crossing; sign board warnings required by statute had been constructed and were in good repair; the speed of the train was lawful; the motorist is under duty to stop for a train; and plaintiff's injury was due to his negligence in riding into the side of the train while the train was occupying the crossing.

Again we must say, these are not the facts of negligence relied

on by plaintiff. Plaintiff relies upon the statutory duty of the train to sound its whistle at a crossing. The breach of this duty is negligence *per se*. For the purposes of demurrer the plaintiff offered ample evidence of the breach of this duty.

"Negligence *per se*" usually consists of the violation of a specific requirement of law or ordinance. (65 C. J. S. Negligence § 1 [e], p. 322; 38 Am. Jur., Negligence, § 158; 28 Words and Phrases, "Negligence Per Se.")

The distinction between "negligence" and "negligence *per se*" is the means and method of ascertainment, in that the former must be found by jury from the evidence, while the latter results from violation of the specific requirement of law or ordinance; and the only fact for determination of the jury is the commission or omission of the specific act inhibited or required. (28 Words and Phrases, "Negligence Per Se", p. 694.)

In this jurisdiction we follow the rule that while the breach of duty imposed by law or ordinance is negligence *per se,* liability in damages cannot be predicated on its violation unless the breach of the law or ordinance is the proximate cause of the injury or damages, or substantially contributes thereto. (*Griffith v. Atchison, T. & S. F. Rly. Co.,* supra; *Williams v. Electric Railroad Co.,* supra; *Cooper v. Railway Co.,* supra; *Whitcomb v. Atchison, T. & S. F. Rly. Co.,* supra; *Richards v. Chicago, R. I. & P. Rly. Co.,* supra.)

Appellee contends the driver's negligence and not the railroad's negligence, if any, was the proximate cause of the accident as a matter of law and relies on *Richards v. Chicago, R. I. & P. Rly. Co.,* supra.

What of proximate cause?

We have often defined it. In *Atherton v. Goodwin,* 163 Kan. 22, 180 P. 2d 296:

"The proximate cause of an injury is that cause which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act." (Syl. 3.)

The plaintiff brought suit separately against the Manley estate and the defendant Atchison, Topeka & Santa Fe Railroad Company. The court consolidated them for trial.

The court overruled the demurrer as to defendant, the Manley estate. Manley's negligence is not a question in this appeal.

It has long been the rule in this state that a driver who negligently

drives in front of an approaching train at a crossing may be joined with the railroad company as a defendant for injuries received by passengers for their concurring negligence. (*Railway Co. v. Durand,* 65 Kan. 380, 69 Pac. 356; *Fliege v. Railway Co.,* 82 Kan. 147, 107 Pac. 555.)

This is also the broad general rule in most jurisdictions. (*Morgan v. Hines,* 260 Fed. 585.)

There can be more than one legal or proximate cause of an accident. (*Stevens v. Jones,* 168 Kan. 583, 215 P. 2d 653; *Neiswender v. Shawnee County Comm'rs,* 151 Kan. 574, 101 P. 2d 226.)

The mere fact that the driver Manley may have been negligent and his negligence a proximate cause of the accident would in no wise excuse the concurrent negligence of the railroad if its breach of statutory duty was also a proximate cause of the accident. (*Taggart v. Yellow Cab Co. of Wichita,* 156 Kan. 88, 131 P. 2d 924; *Morgan v. Hines,* supra.)

In the Taggart case the court said:

"Both appellants insist if any liability was established, the proximate cause of the collision was the negligence of the other appellant. Both, therefore, seek to escape liability. They speak of proximate cause, which is probably more accurately termed 'legal cause' or 'the efficient and procuring cause.' (*Cole v. Shell Petroleum Corp.,* 149 Kan. 25, 37, 86 P. 2d 740.) In any event, neither of those causes nor 'degree of culpability,' is the yardstick by which liability of joint tortfeasors, to an innocent third party, is measured in actions such as this. The measuring device is concurrent negligence. It is apparent the acts of neither appellant alone would, or could, have caused the collision. Furthermore, the extent of injury occasioned by the negligence of each appellant is indivisible. The real question is, therefore, whether the concurrent negligence of appellants contributed to the collision and resulting injury. (*Tilden v. Ash,* 145 Kan. 909, 67 P. 2d 614, and cases therein cited.) See, also, *Neiswender v. Shawnee County Comm'rs,* 151 Kan. 574, 577, 101 P. 2d 226; *Hughes v. Pittsburgh T. Co.,* 300 Pa. 55, 150 Atl. 153; *Carlton v. Boudar,* 118 Va. 521, 88 S. E. 174. Such negligence was clearly established and the tortfeasors are jointly and severally liable for the entire damage. . . ." (p. 96.)

See, also, *Strohmyer v. Ventura,* 178 Kan. 597, 290 P. 2d 1001.

Proximate cause is most always a question for the jury. It becomes a question of law only where the facts are agreed upon and not in dispute. The same rule is followed where the injury is the result of concurring negligence. (38 Am. Jur., Negligence, § 352; *Durst v. Wareham,* 132 Kan. 785, 297 Pac. 675; *Corley v. Railway Co.,* 95 Kan. 124, 147 Pac. 842; *Hartman v. Railway Co.,* 94 Kan. 184,

146 Pac. 335; *Railway Co. v. Parry,* 67 Kan. 515, 73 Pac. 105; *Richards v. Chicago, R. I. & P. Rly. Co.,* supra; *Nevitt v. Railway Co.,* 115 Kan. 439, 223 Pac. 269.)

In the Richards case the court did not hold as a matter of law that the proximate cause of the collision was the negligence of the driver of the automobile in which the plaintiff was riding and not the negligence of the railroad. However, in that case the court found the only fact worthy of consideration for the jury was the speed of the train and this fact by itself had no direct bearing upon the accident in question.

The case here is easily distinguished. The facts are not agreed upon and are very much in dispute, particularly those as to the blowing of the whistle, the negligent act relied upon by plaintiff.

Proximate cause in this case is clearly a matter for the jury and cannot be determined on demurrer as a matter of law.

What of contributory negligence? Was there evidence from which the court could determine on demurrer that the plaintiff was guilty of contributory negligence as a matter of law.

Both parties to this appeal have cited many cases involving crossing accidents and the contributory negligence of a driver, particularly *Horton v. Atchison, T. & S. F. Rly. Co.,* 161 Kan. 403, 168 P. 2d 928; *Johnson v. Union Pacific Rld. Co.,* 157 Kan. 633, 143 P. 2d 630. These authorities are not persuasive. In this case we are concerned with the negligence of a passenger in an automobile and not in the negligence of a driver.

The plaintiff, a passenger, could only be guilty of contributory negligence by: (1) a failure to use due care for his own safety as a passenger in the automobile; (2) under joint enterprise where the negligence of the driver would be imputed to him.

These two bases for contributory negligence of one who is riding in an automobile as a passenger were discussed and distinguished in a leading Kansas case *(Corley v. Railway Co.,* 90 Kan. 70, 133 Pac. 555).

In that case Corley, the plaintiff's husband, was riding in an automobile as a guest of a friend who was driving it. At a crossing it was struck by a train of the Atchison, Topeka & Santa Fe Railway Company and all the occupants were killed. The plaintiff sued for the loss of her husband.

The case reviewed the earlier cases of liability to passengers and restates the well established rule in this jurisdiction that the negli-

gence of a driver is not imputed to one who is riding in an automobile as a passenger. In the opinion the court said:

"The defendant further maintains that a judgment in its favor on the issue of contributory negligence is required by the findings. These show that at a distance of twenty feet from the track the train could have been seen by the deceased. This would doubtless preclude a recovery if he had been managing the automobile. Reasonable prudence required the driver to approach the crossing with his car under control, to look for the train as soon as he was in a position to see it, and to stop as soon as he knew of its approach. What the deceased actually did is not shown, and there is no ground for attributing to him personally any want of care. The question presented is whether he is to be deemed chargeable with the negligence of the driver. The doctrine that one who voluntarily becomes a passenger in a conveyance thereby so far identifies himself with the driver that he can not recover for an injury negligently inflicted by a third person, if the driver's negligence was a contributing cause, never gained much of a foothold in this country, and is now repudiated in England, where it originated. The history of its rise and decline is traced in a note in 8 L. R. A., n. s., 597, where cases are gathered illustrating all phases of the subject. Save in a few jurisdictions the negligence of a driver can not be imputed to a passenger who in fact has no control over him. (Note, 9 A. & E. Ann. Cas. 408; Note, 19 A. & E. Ann. Cas. 1225; Note, Ann. Cas. 1913 B. 684; see, also, *Denton v. Railroad Co.*, ante, p. 51.) This rule applies in the case of a guest who is riding with the driver for their mutual pleasure. (29 Cyc. 548-550; Note, 8 L. R. A., n. s., 648; 7 A. & E. Encycl. of L. 447, 448.) Where two persons are engaged in a common enterprise, using a conveyance for their purpose, each is said to be responsible for the acts of the other, but for this situation to arise each must have an equal right of control. (29 Cyc. 543; Note, 8 L. R. A., n. s., 628.) In the present case the jury found that the deceased was riding with the owner of the automobile as an invited guest on a pleasure trip. The defendant therefore can not successfuly invoke the doctrine of imputed negligence." (pp. 73, 74.)

This rule on imputed negligence has never seriously been questioned in this jurisdiction and has been followed repeatedly in our decisions. (*Anthony v. Kiefner*, 96 Kan. 194, 150 Pac. 524; *Denton v. Railroad Co.*, 97 Kan. 498 155 Pac. 812; *Burzio v. Railroad Co.*, 102 Kan. 287, 171 Pac. 351; *Clark v. Railroad Co.*, 115 Kan. 823, 224 Pac. 920; *Bower v. Railroad Co.*, 106 Kan. 404, 188 Pac. 420; *Calvin v. Schaff, Receiver*, 118 Kan. 196, 234 Pac. 1006.)

Although the negligence of the driver may not be so imputed, the passenger has a duty to protect himself and may be barred of recovery because of his independent negligence. The test applied to determine whether the passenger is contributorily negligent has varied somewhat over the years. Laws of the early cases which repudiated the doctrine of imputable negligence discussed the duty of the pas-

·senger. (*Bush v. Railroad Co.*, 62 Kan. 709, 64 Pac. 624; *Railway Co. v. Bussey*, 66 Kan. 735, 71 Pac. 261; *Williams v. Withington*, 88 Kan. 809, 129 Pac. 1148; *Denton v. Railway Co.*, 97 Kan. 498, 155 Pac. 812; *Corley v. Railway Co.*, 90 Kan. 70, 133 Pac. 555; *Burzio v. Railway Co.*, supra; *Schaefer v. Interurban Railway Co.*, 104 Kan. 394, 179 Pac. 323; *Kirby v. Railway Co.*, 106 Kan. 163, 186 Pac. 744; *Nevitt v. Railway Co.*, 115 Kan. 439, 223 Pac. 269; *Bradshaw v. Payne*, 111 Kan. 475, 207 Pac. 802; *Kessler v. Davis*, 111 Kan. 515, 207 Pac. 799; *Hough v. Atchison, T. & S. F. Rly. Co.*, 133 Kan. 757, 3 P. 2d 499; *Cooper v. Railway Co.*, 117 Kan. 703, 232 Pac. 1024; *Billings v. Aldridge*, 133 Kan. 769, 3 P. 2d 639; *Shepard v. Thompson*, 153 Kan. 68, 109 P. 2d 126; *Heiserman v. Aikman*, 163 Kan. 700, 186 P. 2d 252; *Miller v. Union Pac. R. Co.*, 196 F. 2d 333; *Buechhein v. Atchison, T. & S. F. Rly. Co.*, 147 Kan. 192, 75 P. 2d 280; *Hooker v. Missouri Pac. Rld. Co.*, 134 Kan. 762, 8 P. 2d 394; *Blue v. Atchison, T. & S. F. Rly. Co.*, 126 Kan. 635, 270 Pac. 588; *Ewing v. Railroad Co.*, 117 Kan. 200, 206, 231 Pac. 334; *Rathbone v. Railway Co.*, 113 Kan. 257, 259, 214 Pac. 109; *Knight v. Railway Co.*, 111 Kan. 308, 206 Pac. 893.) The cases are collected and discussed up through *Billings v. Aldridge*, supra, in 1 Kansas Bar Journal 145.

Two of the more recent cases cited state the duty of the passenger in this language. In *Shepard v. Thompson*, supra, the court said:

"Only brief comment need be made upon the fact that the deceased, husband of the appellee, was not the driver of the auto. The rule is well established in this state that a guest or passenger in an automobile is under a duty to exercise reasonable care and precaution for his own protection, that he cannot recover damages if he fails to exercise such precaution and to give warning to the driver of an imminent danger. . . ." (p. 74.)

In *Miller v. Union Pac. R. Co.*, supra, the court said:

"In this case, the father and mother, as parents and next of kin, sought recovery for the death of their son, Warren Dean Miller, who was a guest passenger in the truck. As a passenger, it was his duty under the decisions of Kansas to exercise reasonable care and precaution for his protection. It was his duty to look for approaching trains and warn the driver thereof. Failure to do these things would constitute contributory negligence on his part, . . ." (p. 335.)

Kansas has held without deviation that it will be presumed that a person exercises reasonable care for his safety. And in the absence of evidence or circumstances to the contrary, the presumption is that before venturing to cross a railroad track one will both look

and listen before doing so. This implies that a passenger both looked and listened and warned the driver of an approaching train near the crossing. *(Miller v. Union Pac. R. Co.,* 196 F. 2d 333.)

The evidence of the plaintiff in this case meets the test of due care by a passenger for his own safety. The plaintiff testified that he looked for approaching trains, saw the train, and warned the driver repeatedly. His testimony was corroborated by Matthews, one of the other passengers in the car. Since there is no evidence as yet to the contrary it may also be presumed he exercised reasonable care for his safety.

Under the rule on demurrer to the evidence the plaintiff is not guilty of contributory negligence as a matter of law. The issues of fact pertaining thereto must be determined by the jury. *(Miller v. Union Pac. R. Co.,* supra; *Hough v. Atchison, T. & S. F. Rly. Co.,* supra; *Billings v. Aldridge,* supra; *Nevitt v. Railway Co.,* supra, *Schaefer v. Interurban Railway Co.,* supra.)

Is the plaintiff barred of recovery because the negligence of the driver is imputed to him under joint enterprise?

The only evidence before the court relative to this issue was the statements of the plaintiff and Matthews. Both testified that they were in a car pool with Manley for the purpose of saving expenses and the necessity of driving their cars every day. They also testified that the driver had the right to pick his own route and that none of the riders had control over the manner in which he drove.

The court said in *Schmid v. Eslick,* 181 Kan. 997, 317 P. 2d 459:

"To constitute a joint enterprise between a passenger and a driver of an automobile, there must be a common purpose for which they jointly use and occupy the motor vehicle so as to give each the equal privilege and right to control and manage its operation." (Syl. 1.)

The evidence on demurrer here does not show a joint enterprise existed between the driver and the plaintiff as a matter of law. *(Kessler v. Davis,* supra; *Bradshaw v. Payne,* supra; *Heiserman v. Aikman,* supra.)

It was erroneous for the trial court to sustain the demurrer of defendant Atchison, Topeka & Santa Fe Railroad Company to the plaintiff's evidence.

The ruling of the trial court on the demurrer to the evidence is reversed, the judgment thereafter rendered is set aside, and the cause is remanded for further proceedings.

It is so ordered.

SCHROEDER, J., (concurring specially): Under all the facts and circumstances presented by the record in this case the proximate cause of plaintiff's injury remains a question of fact for the jury in my opinion. It is contended that even if the whistle had been sounded, the act of doing so would not have given any further notice to plaintiff than what he already had, and which he had already imparted to the driver. This sounds convincing until other evidence, not heretofore disclosed in the opinion, is revealed.

The testimony discloses that plaintiff and Matthews, who were riding in the back seat of the auto, jested with each other. The plaintiff (Kendrick) testified on direct examination:

"Q. What did you do with it (the comic book plaintiff was reading while riding in the automobile prior to accident)?

"A. Well, we got up to Akron, and of course Tod (Tolliver Matthews) and I we were always cutting up anyway, and I just kind of flipped it over in his lap, as a gesture of, oh, like a comedian would."

Matthews on direct examination testified:

"Q. Do you recall whether or not Donald Kendrick had been reading?

"A. Yes, he had been.

"Q. Do you know when he quit?

"A. Somewhere along around in Akron, there, I think he hit the book at me.

"Q. You think he did what?

"A. I think he threw the book at me.

"Q. What do you mean threw the book at you?

"A. Oh, just tossed it over in my lap.

"Q. Did you read it?

"A. Well, I picked it up and looked at it and I seen I had read it, and I think that's when I noticed the train, I turned around to throw the book back."

Thus, the moral in the old fable of the shepherd boy, who after one false alarm shouted "Wolf" a second time in truthful need but without response from his neighbors, may have practical application here. A jury may find that the driver (Manley) did not comprehend the significance of the warning given by the passengers in the auto because their previous conduct in jesting with each other had the effect of misleading him. Under such circumstances a jury was entitled to determine whether failure to sound a whistle, if this be a fact, was a contributing proximate cause of the injury. Here the court is not confronted with successive acts of negligence as in *Hickert v. Wright*, 182 Kan. 100, 319 P. 2d 152, but with concurrent acts of negligence.

Whether plaintiff's conduct in jesting was sufficient to bar his recovery on the ground of contributory negligence, likewise remains for a jury to determine.

Another circumstance indicated by the evidence, not heretofore disclosed, is significant. Several witnesses testified that as one approached the railroad crossing in the manner herein disclosed on the day and at the time in question the sun was in such location that it shone directly into the eyes of a driver, unless the eyes were shaded, when looking up the track for a train in the direction from which this train was coming.

Taking into consideration all of the facts and circumstances disclosed by the record herein, I fully concur in the court's opinion.

PARKER, C. J. (dissenting): I concede this case presents a close question. However, after reviewing all the evidence in the light of the rule announced in paragraph 2 of the syllabus, I have become convinced that under the existing facts and circumstances negligence of the driver of the involved automobile was the proximate and legal cause of this tragic accident. In that situation I am constrained to conclude the trial court should have sustained the demurrer to the evidence on that basis, hence this dissent.

PRICE, J., dissenting: I do not agree to the disposition being made of this case and think that the demurrer was correctly sustained.

As between these two litigants, the crux of this case is proximate cause. Plaintiff's own testimony affirmatively establishes that he saw the train and warned the driver in ample time for him to slow or stop. The warning went unheeded. Assuming, but not conceding, the whistle was not blown, the fact remains that had it been blown the act of doing so would not have given any further notice to plaintiff than what he already had, and which he had already imparted to the driver. Negligence, in order to be *actionable,* must constitute the *proximate cause* of an injury. From plaintiff's evidence it is not even debatable that the sole proximate cause of this unfortunate collision was the negligence of the driver in driving his automobile into the side of the train.

In my opinion the decision reached in this case tends "to mold the law to fit the facts," whereas the proper function of courts is *to measure the facts in the light of established law!*

I would affirm the ruling below, and therefore respectfully dissent.